**CHECKPOINT SYSTEMS, INC., Plaintiff,**

v.

**CHECK POINT SOFTWARE TECHNOLOGIES, INC., Defendant.**

No. CIV.A.96–3153(JBS).

United States District Court, D. New Jersey.

July 12, 2000.

Hauer & Feld, LLP, Philadelphia, PA, for Plaintiff.

Robert J. Del Tufo, Skadden, Arps, Slate, Meagher & Flom LLP, Newark, NJ, Kenneth Plevan, Esther S. Trakinski, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Defendant.

Susan S. Singer, Singer & Groger, Newark, NJ, Roberta Jacobs–Meadway, Jordan A. LaVine, Akin, Gump, Strauss,

*Findings of Fact and Conclusions of Law*

SIMANDLE, District Judge:

### Table of Contents

I. INTRODUCTION .................................................... 430

II. PROCEDURAL HISTORY .......................................... 431

III. FINDINGS OF FACT ............................................. 431

  A. *Plaintiff and its business* ...................................... 431
    1. *History and founding of company* ......................... 431
    2. *Products sold* ............................................ 433
      a. *EAS (Electronic Article Surveillance) Systems* ........ 433
      b. *EAC (Electronic Access Control) Systems* ............ 433
      c. *CCTV (Closed Circuit Television) Systems* ........... 434
      d. *RFID (Radio Frequency Identification Device)* ....... 435
      e. *Use of the Checkpoint mark on these products* ....... 435
    3. *Percent of revenues* ..................................... 436
    4. *Major competitors and relative market shares* ........... 436
    5. *Marketing techniques, advertising and trades shows* ..... 437
    6. *Sophistication of purchasers, sales modes, time cycles, and end-user interaction* .......................................... 438

  B. *Defendant and its business* ................................... 438
    1. *History and founding of company* ......................... 438
    2. *Products sold* ............................................ 440
      a. *Products which perform network security functions: firewalls and VPNs* .......................................... 440
      b. *Products which do not perform network security functions* ............ 441
    3. *Percent of revenues* ..................................... 442
    4. *Major competitors and relative market shares* ........... 442
    5. *Marketing techniques, advertising, and trade shows* ..... 442
    6. *Sophistication of purchasers, sales modes, time cycles, and end-user interaction* .......................................... 443

  C. *Though they are major participants in different submarkets of corporate security, the parties are not competitors* ........................... 445

  D. *Instances of actual confusion* ................................. 447

  E. *The corporate security environment* ........................... 450
    1. *Evidence of convergence of physical and information security markets* ......................................... 450
    2. *Evidence of divergence and specialization* ............... 452
    3. *Lack of generality regarding purchasers* ................ 454
    4. *Specialization of skills* ................................. 454
    5. *Tendency of physical security toward protection of information, including network security* .......................................... 455

IV. *CONCLUSIONS OF LAW* ............................................. 456

    A. *Liability for Infringement and Unfair Competition* ......................... 456
       1. *Similarity of Overall Commercial Impressions of the Marks* .............. 457
       2. *Strength of Plaintiff's Mark* ...................................... 458
       3. *Price of Goods, Sophistication of Purchasers, Care and Attention*
          *Expected of Reasonable Consumers* .................................... 460
       4. *Length of Time Parties Have Used Their Marks Without Evidence of*
          *Actual Confusion, and the Evidence of Actual Consumer Confu-*
          *sion* ............................................................. 460
       5. *Intent of Defendant in Adopting the Mark* ........................... 465
       6. *Parties' Channels of Trade, Markets, Target Customers, and Likeli-*
          *hood of Expansion* .................................................. 466

    B. *Ultimate Conclusion of Law: No Likelihood of Confusion* .................. 467

## I. *INTRODUCTION*

In this action alleging trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114 & 1125(a), plaintiff Checkpoint Systems, Inc. ("Checkpoint") alleges that the defendant, Check Point Software Technologies, Inc. ("CPS") has used the marks "CHECKPOINT," "CheckPoint," and "Check Point" in violation of plaintiff's registered trademark for "Checkpoint." Plaintiff Checkpoint is a leading company in the field of retail security, manufacturing and distributing products under the Checkpoint mark designed to help retailers prevent losses caused by theft of merchandise and also to help manage the inventory and supply chain of products or merchandise. Defendant CPS is a leading company in the Internet-related field of protecting the electronic data flow in computer networks from electronic intrusion and monitoring the flow of data between the Internet and private intranets of its customers. Defendant markets its network security products as "Check Point Software Technologies" and has also used the names "Check Point" and "Check-Point." The companies are not competitors.

Plaintiff seeks to enjoin defendant from any further use of the Checkpoint name, including any of its similar variations, and this Court, having conducted a non-jury trial, must decide whether plaintiff has proved entitlement to such relief. Plaintiff's request for monetary damages is no longer before the court, having been denied by summary judgment, there having been no evidence of financial loss or willful infringement.

The principal issue to be decided is whether defendant's use of the mark (Checkpoint, CheckPoint, or Check Point) to identify its goods and services is likely to create confusion. Although the similarity in corporate names is clear, and such similarity is an important factor in determining whether consumers are likely to be confused about the origin of these non-competing products, this similarity is only the first factor in the analysis required by cases such as *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229–31 (3d Cir.1978) and *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 473 (3d Cir.1994). These *Scott/Fisons* factors are the considerations regarding the context in which the mark is used in the marketplace which must be weighed to answer the central question of whether plaintiff has proved, by a preponderance of the evidence, that consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark. This Court will examine the evidence, and lack of evidence, regarding likelihood of confusion with respect to likelihood that a consumer viewing defendant's mark would probably assume that it is associated with plaintiff, and also the "reverse confusion" issue of whether a consumer viewing plain-

tiff's mark would probably assume that it is associated with the defendant.

For the reasons stated herein, the Court concludes that plaintiff has not demonstrated the likelihood of actionable confusion, nor of reverse confusion, with respect to defendant's use of the contested marks, and that the plaintiff is therefore not entitled to relief under the Lanham Act.

## II. *PROCEDURAL HISTORY*

Plaintiff Checkpoint Systems, Inc. ("Checkpoint") filed its Complaint against defendant Check Point Software Technologies, Inc. ("CPS") alleging trademark infringement and unfair competition on July 5, 1996. The parties engaged in several rounds of motion practice. First, on May 26, 1998, this Court issued an Opinion and Order denying the parties' cross-motions for summary judgment. Second, on May 17, 1999, this Court entered an Opinion and Order granting plaintiff's motion in limine to exclude the testimony of defendant's expert Dr. Dov Frishberg and denying defendant's motion in limine to exclude the testimony of plaintiffs' experts Ira Somerson, Dr. Robert D. McCrie, David L. Johnston, Peter E. Ohlhausen, and Dr. Sanford Sherizen. Third, on May 17, 1999, the Court also entered an order granting plaintiff's motion for leave to renew its motion for summary judgment. Thereafter, the parties filed renewed cross-motions for summary judgment, supplementing their earlier motions with new exhibits. On October 28, 1999, this Court denied the plaintiff's motion for summary judgment and granted in part and denied in part defendant's motion for summary judgment, precluding plaintiff from seeking damages and attorneys' fees.

A non-jury trial in the matter was held November 1–4, 8–10, and 23, 1999. Plaintiff Checkpoint presented the testimony of Kevin Dowd (plaintiff's Chief Executive Officer), Steven Wagner (plaintiff's V.P. of Access Control), John Thorne (plaintiff's former Director of Product Management),

Craig Knick (Sales Engineer for plaintiff), and Thomas Upshur (plaintiff's Senior Director of RFID Marketing and Product Management), as well as expert testimony of Ira Somerson (security management), Peter Ohlhausen (corporate security), Dr. Sanford Sherizen (information security), Dr. Robert McCrie (corporate security), and David Johnston (corporate security). The Court then denied, on November 4, 1999, defendant's application for a judgment on partial findings pursuant to Fed. R.Civ.P. 52(c).

Defendant CPS presented testimony of Kin Mitra (a CPS Regional Director of Sales), Kelly O'Connor (CPS's Director of Marketing Communications), Schlomo Kramer (CPS's former Director and founder), Rakeesh Loonkar (a CPS value added reseller ("VAR")), Charles Breed (V.P. of Kroll O'Gara's Information Security Group), William Lavelle (a CPS Territorial Manager), Deborah Rieman (CPS's former Chief Executive Officer), and Gary Fish (a CPS VAR), as well as the expert testimony of Philip Stern (corporate security) and John Morency (computer networking).

Additionally, both parties submitted into evidence deposition designations and responses to written discovery requests. The parties submitted proposed findings of fact and conclusions of law, and final argument was heard on January 14, 2000. The Court now issues its final ruling.

## III. *FINDINGS OF FACT*

### A. *Plaintiff and its business*

#### 1. *History and founding of company*

Plaintiff Checkpoint is a Pennsylvania corporation having its principal place of business at 101 Wolf Drive, Thorofare, New Jersey 08086. (DX–9).[1] Since 1967, plaintiff and its predecessors have been engaged in the manufacture and sale of electronic security equipment and systems

1. DX refers to "Defense Exhibit." PX refers to "Plaintiff's Exhibit."

for retail and other commercial applications and computer-based access control systems for commercial applications. (DX–10.) The essence of Checkpoint's business is to help retailers protect against theft of merchandise from stores, as discussed below. Plaintiff claims that it provides comprehensive corporate security solutions. (Dowd Tr. 34; McCrie Tr. 755; Olhausen Tr. 476.) A public company, its stock was traded on NASDAQ from 1977 through 1993 and on the N.Y. Stock Exchange from October 29, 1993 to the present, under the symbol "CKP." (Dowd Tr. 37.)

Plaintiff has earned an excellent reputation and has achieved commercial success in the field of retail corporate security, including primarily the detection of pilferage of merchandise from retail stores by patrons or employees, in which it is one of two dominant players. (Thorne Tr. 267; DX–9–11.)

Checkpoint has used the "CHECKPOINT" mark and name since at least early as May 8, 1967. (Dowd Tr. 34, 90.) It owns U.S. Trademark Registration Nos. 845,817 and 844,752 for "CHECKPOINT;" these registrations are valid, subsisting, incontestable, and renewed. (Dowd. Tr. 90; PX–1–2.) Indeed, defendant has not challenged the validity of these registrations or plaintiff's ownership of them.

Checkpoint has grown over the years, largely by acquiring other companies. As it has acquired other companies, it has consistently changed their names so that the acquired companies employ the "CHECKPOINT" mark and name, thereby underscoring for the relevant public that companies plaintiff's business using the "CHECKPOINT" mark and name are part of a corporate family. (Dowd Tr. 40–41.) The "CHECKPOINT" family includes Checkpoint Systems, Inc. and Checkpoint Security Systems Group, Inc. (formerly Alarmex), and those companies purchased by Checkpoint and subsequently operated within Checkpoint, such as Sielox. (Dowd Tr. 49, 125.) Checkpoint is

currently in negotiations to acquire Meto AG to further expand Checkpoint's capabilities in the radio frequency identification devices ("RFID") market, again in the field of retail security. (Dowd Tr. 41–42.) Additionally, Checkpoint has acquired companies in Europe to expand geographic reach. (Dowd Tr. 38–40.) It has had a presence in Israel since at least early 1980. (McCrie Tr. 757.)

In its 1998 Annual Report to shareholders, plaintiff reported its corporate "Vision" as follows: "To establish Checkpoint Systems, Inc., as the premier worldwide radio frequency technology supply chain management solutions provider." (DX–55.) Plaintiff used similar terminology to describe the rationale for its $300 million acquisition of Meto AG, a European-based competitor. (DX 110: "global retail supply chain management provider.") Similarly, plaintiff described its "Mission" as "provid[ing] retailers, commercial and industrial businesses, and systems integrators with comprehensive radio frequency technology-based supply chain management and security solution that move goods effectively and efficiently, control shortage losses, improve sales and profitability, and ensure the accuracy and security of assets." (Id.) In that same report (DX–55 at 15), in language largely unchanged over the last several years (Dowd Tr. 118–19), plaintiff described the essence of its business as helping retailers protect against theft and to thereby improve the display options for merchandise:

- "Checkpoint is a designer, manufacturer, and distributor of integrated electronic security systems ... designed primarily to help retailers prevent losses caused by the theft of merchandise."

- "The Company's diversified product lines are designed to help retailers prevent losses caused by theft (both by customers and employees) and reduce selling costs through lower staff requirements."

● "The Company's products facilitate the open display of consumer goods, which allow the retailer to maximize sales opportunities."

*Id.*

### 2. *Products sold*

Throughout its over 30 year history, Checkpoint has expanded and diversified its business and product lines both through internal development and by acquiring other companies in the corporate security industry. (Dowd Tr. 38–42.) Its security systems consist essentially of four types of products: (i) electronic article surveillance ("EAS") systems, including point of sale monitoring systems (introduced in libraries in 1967), (ii) access control systems ("EAC") (introduced in 1986), (iii) closed circuit television ("CCTV") systems (introduced in 1995), and (iv) radio frequency identification device ("RFID") products (introduced in 1999). (DX 55 at 16–17; Dowd Tr. 34, 38, 39.) Despite this diversification, Checkpoint's name and reputation is primarily associated with its traditional strength in electronic article surveillance ("EAS") systems, comprising about 90% of its revenues, as discussed below. Each product line is now described.

### a. *EAS (Electronic Article Surveillance) Systems*

Checkpoint's EAS systems are comprised of three components: tags or labels having circuitry, electronic sensors, and deactivation equipment. (Thorne Tr. 249, 251; PX–3; DX–9.) The EAS systems alert users to unauthorized removal of merchandise from stores, books from libraries, and software and hardware from data centers. (Dowd Tr. 39; Thorne Tr. 249–50; PX–3.) Such tags are placed on items of merchandise and they are read and deactivated when the customer transacts the item. If the customer or employee attempts to take the item from the store without paying for it, an antenna, usually at an exit, will detect the tag and will sound an alarm so that the event can be checked by store security personnel.

While plaintiff's EAS systems are typically installed in retail establishments, they are also used in non-traditional settings, such as in nuclear plants by placing EAS tags in proprietary documents in a secured area. (Thorne Tr. 274–75.) Checkpoint's EAS products are integrated with other security systems, including POS and CCTV systems (described below); that integration capability provides a key competitive advantage. (Thorne Tr. 250–51.)

### b. *EAC (Electronic Access Control) Systems*

Of far lesser importance in Checkpoint's sales line, plaintiff's electronic access control systems prevent unauthorized access to restricted areas. (Wagner Tr. 148, 208.) These software-driven lines feature dial-in networking capabilities and prevent loss of an organization's assets. (Wagner Tr. 148–49; Dowd Tr. 51.) Checkpoint's EAC software products reside on a CD–ROM so the system can be implemented on an organization's server. (Wagner Tr. 149.) The EAC systems not only keep track of persons accessing buildings, but also persons accessing equipment and items including software within restricted areas. (Wagner T. 156–57.)

Employees are given security cards with integrated circuits that allow them access to certain areas. (Wagner Tr. 159.) Such cards, also used in connection with Checkpoint's CCTV products (described below), are a type of "smart card," as intelligence can be written onto the card. (Wagner Tr. 237.) In the future, such cards could enable log-on access to computers. (Wagner Tr. 238.) No such products are currently in development by plaintiff, however. These systems allow the integration of third party software packages to enhance the basic EAC system. (Wagner Tr. 154–55.) Checkpoint developed for January 2000 introduction a product that will track the movement of assets throughout an organization, and permit or deny physical movement of those assets (including personnel) based upon authorization. (Wagner Tr. 165.)

The EAC products (like the POS and CCTV systems described below) are integrated with a customer's computer system, ranging from the single workstation of a "mom and pop" store to a computer network or network of networks utilized by major national retail chains. (Wagner Tr. 149, 155–56.) Checkpoint's Value Added Resellers ("VARs") build the proprietary networks that carry Checkpoint's EAC products, or can integrate Checkpoint's products into a pre-existing network. (Wagner Tr. 210–11.)

The EAC products reside on a LAN (local area network) or WAN (wide area network) and process the systems' signals based on privileges allowed by the network manager under the network's protocol. (Wagner Tr. 240–41.) Under these protocols, network managers place restrictions on who can access information contained in certain directories. (Knick Tr. 330, 380.) The information contained in the EAC products and generated by the EAC products is maintained in a database, and may include an employee's job title, vehicle license numbers, address, or similar information. (Knick Tr. 388–39.) Levels of authority may be assigned to managers or users of the EAC system, thereby allowing only persons of certain assigned levels to have access to proprietary information. (Knick Tr. 389.)

Among plaintiff's EAC products are the "THRESHOLD" products, software-driven, multi-tasking, multi-operator systems. (Wagner Tr. 151–53; PX–23; PX–23(a).) This includes "THRESHOLD NT," which may be run on the Internet. The product brochure for these products indicates that with these products, CCTV, ID imaging, time, attendance, activity management, air conditioning controls, and lighting controls can all be integrated, allowing "pinpoint precise data management. . . ." (PX–23(a).) The THRESHOLD products have the capability to encrypt the data generated by Checkpoint's EAC systems. (Knick Tr. 354.)

### c. CCTV (Closed Circuit Television) Systems

Checkpoint's closed circuit television systems and point of sale (POS) systems generate data at the point of sale in video and electronic form and transfer the data which is subsequently integrated and electronically sent to remote locations to be used for employee audit and inventory management and control. Such systems currently transfer such information over traditional telephone lines, but will, in the near future, transfer such information over customers' LAN or WAN. (Dowd Tr. 35; Wagner Tr. 206–07, 212.) One such CCTV product is VIEWPOINT, a total transaction monitoring system and computerized point of sale scanning system that has remote dial-in capabilities. (Dowd Tr. 35; Thorne Tr. 265; PX–26.) VIEWPOINT electronically records and stores point of sale transactions from multiple point of sale locations via CCTV surveillance and cash register scanners. A relational database and report generation allows for identification of suspicious transactions. (*Id.*)

The latest developments in plaintiff's line of POS and CCTV products establish the foundation for a POS system that transmits secure digital images to remote locations, so security managers can monitor facilities from remote locations. This monitoring depends on a secure computer network connection such as that which network security software provides. (Dowd Tr. 35.)

Such products can and have been integrated. For example, Rite Aid Corporation acquired a company named SASSY to build its IS and POS systems for its drug store chain. The SASSY group developed a POS monitoring system so that Rite Aid's Chief Information Officer ("CIO") could remotely monitor sales activity occurring in other parts of the country. (Thorne Tr. 282.) Rite Aid approached plaintiff to assist with developing this system so that other applications, such as heating, air-conditioning, attendance, and security applications could be integrated

on a single network. (Thorne Tr. 282.) Such a program is currently in "alpha" testing. (Thorne Tr. 283.)

### d. RFID (Radio Frequency Identification Device)

In 1997, plaintiff began *Diamond Checkpoint Development Group*, a joint research and development relationship with Mitsubishi Materials Corporation of Japan. (Dowd Tr. 51–51; DX–10.) The research and development aims at combining radio frequency ("RF") security tags with integrated circuits. (Dowd Tr. 51–52.) The resulting "intelligent tags" carry, among other things, information about a product's history from initial manufacturing through distribution, sale, and, ultimately, consumer record keeping. (Thorne Tr. 251–53.) Such tags surpass traditional bar codes in their ability to store and communicate information concerning specific items and do not have bar coding's line of sight limitations on data capture. (Thorne Tr. 251–52; Upshur Tr. 392.) The proprietary information generated is entered into a database server and can be transmitted virtually anywhere that the user wishes via computer. (Dowd Tr. 45, 49; Thorne Tr. 253.) In early 2000, plaintiff plans to introduce a "read and write" tag that will allow users to add or delete information contained in a RFID tag. (Dowd Tr. 52.) The RFID products are not only directed to retail applications, but also to libraries and commercial and industrial applications. (Upshur Tr. 392–93.)

Plaintiff's acquisition of Meto AG would further expand Checkpoint's capabilities in the RFID field throughout the world. (Dowd Tr. 41–42.)

Plaintiff's products, as with many commercial products and services, are thus becoming more computer-driven. They are also structured such that they can perform non-security functions, such as monitoring inventory and the movement of equipment. They also continue to serve crucial functions in the world of corporate security, focusing on physical security of products and personnel, for which plaintiff is known.

### e. Use of the Checkpoint mark on these products

Checkpoint's "CHECKPOINT" trademark is prominently displayed on Checkpoint's products, including tags and sensors, access control cards, product specification sheets, and computer screens. (PX–3; PX–4; Wagner Tr. 160, 163; Thorne Tr. 257, 259–60, 262, 288.) Approximately 30–40,000 antennae for retail merchandise security with the CHECKPOINT mark were sold in 1998. (Thorne Tr. 257.) There are approximately 350,000 antennae bearing the mark in the marketplace. (Thorne Tr. 258.) Often these antennae are placed as detection devices at the exits of retail stores. Approximately 500,000 Checkpoint hard tags in circulation bear the CHECKPOINT mark. (Thorne Tr. 262–63.) In 1997 and 1998, Checkpoint sold 150,000 and 200,000 access control cards, respectively, each of which bears the CHECKPOINT mark. As of the time of trial, plaintiff expected that it would sell in excess of 300,000 access control cards in 1999. (Wagner Tr. 160.) The CHECKPOINT mark is also displayed briefly on a user's computer screen when the access control system is loading. (Wagner Tr. 163.)

### 3. Percent of revenues

Plaintiff, a growing company, has experienced substantial financial success. (Dowd Tr. 37.) Gross revenues increased from approximately $50 million in 1990 to over $360 million in 1998. *Fortune* magazine identified plaintiff as one of America's fastest growing companies in 1996. (Dowd Tr. 67; PX–9.)

The electronic article surveillance business represents far and away the largest part of plaintiff's business, about 90%. (Thorne Tr. 271.) EAS products are sold primarily to retail, industrial, institutional, and government users. (Dowd Tr. 34–36, 54; Wagner Tr. 172; Thorne Tr. 251, 276.)

Checkpoint's projected 1999 revenues for its EAS systems are in the range of $365–380 million. Checkpoint has many thousands of accounts for its EAS systems throughout the U.S. (Thorne Tr. 272.) Representative end users of Checkpoint's EAS products include: Circuit City, Target, Rite–Aid, Eckerd Drug, Barnes & Noble, Staples, Giant Foods, and Burlington Coat Factory. (Dowd Tr. 34–36, 134–135; Thorne Tr. 251, 269.) Checkpoint also sells its EAS products to smaller companies and smaller regional and local retailers. (Dowd Tr. 64; Thorne Tr. 275.)

Plaintiff's EAC, POS monitoring, and CCTV products, however, constitute less than a 10% component of Checkpoint's business. (Dowd Tr. 35; Wagner Tr. 147.) Revenues for Checkpoint's EAC products were expected to be $15 million in 1999 (Wagner Tr. 234), which constitutes three percent of Checkpoint's gross revenues but at least five percent of Checkpoint's profits. (Wagner Tr. 244.) Access control sales are estimated in 1999 at $15 million annually, a tiny fraction of plaintiff's total postmerger sales. (Wagner Tr. 164, 234–35.)

### 4. *Major competitors and relative market shares*

In the article surveillance (EAS) area, plaintiff's market share of domestic EAS sales is 30% (Dowd Tr. 38.), but it dominates the drug store segment with over 70% of that market. (Thorne Tr. 267.) Plaintiff's biggest competitor in the U.S., Sensormatic Electronics Corporation ("Sensormatic"), has 45% of the market. In the access control (EAC) area, on the other hand, Checkpoint has at least 25 competitors, and its market share is small. (Wagner Tr. 192.) Plaintiff also sells access control products through independent distributors. (Wagner Tr. 171.) Plaintiff has many tens of thousands of customers. (Dowd Tr. 108.) Its alarm business alone has 50,000–60,000 customers. (Upshur Tr. 406.)

### 5. *Marketing techniques, advertising and trades shows*

Checkpoint promotes its products primarily through direct mailings to security systems dealers, trade shows, advertisements, its direct sales force, and its Internet website. (Dowd Tr. 53; Wagner Tr. 185; Thorne Tr. 285.) Plaintiff spends approximately eight million dollars annually on advertising and marketing (Thorne Tr. 275, 285), which is over two percent of its 1998 revenues. All of its advertising and promotional materials prominently display the CHECKPOINT mark and are for products and systems under the CHECKPOINT mark and name. (Dowd Tr. 53; PX–3; PX–4; PX–23; PX–26; PX–27.) Checkpoint uses its name in, *inter alia*, press releases and promotional materials to further Checkpoint's business among the relevant public. (Dowd Tr. 53.)

Plaintiff's employees attend hundreds of trade shows each year, including Comdex, the annual American Society of Industrial Security ("ASIS") trade show and conference, and ScanTech. (Dowd Tr. 53; Knick Tr. 335.) Plaintiff also promotes its products at the National Retail Federation Show, the FMI Technology Show (for food marketers), and the International Security Conference. (McCrie Tr. 776; PX–90.) Checkpoint attends trade shows where it is not necessarily exhibiting its products to collect information on market trends, determine what products are of interest to potential customers, and determine what products Checkpoint might be able to integrate into its own products. (Thorne Tr. 286.)

Plaintiff has employed a public relations firm for the last eleven years. (Dowd Tr. 59–60.) Checkpoint sends public relations mailing to approximately forty (40) publications, including publications of general interest, financial-related magazines, and publications concerned with both physical and computer corporate security. (Dowd Tr. 59–60.) The two magazines in which Checkpoint concentrates the majority of its advertising are *Security* and *Today's*

*Facility Manager.* (Wagner Tr. 187; PX–13.) With the introduction of Checkpoint's RFID products, Checkpoint is advertising in *Automatic ID News* (Upshur Tr. 396–97; PX–129), the primary information resource for automated data capture and communications (ADC) decision-makers who make technology decisions to enable the seamless collection of data and its integration into software applications and the enterprise computing infrastructure. (Upshur Tr. 397.) Plaintiff also advertises in publications targeted to specific vertical retail markets, such as *Modern Mass Merchandiser* and *Supermarket News.* (Wagner Tr. 187–88.)

*Security* is directed to the security industry, generally, and contains advertisements for the products of Checkpoint and others that manufacture physical security systems, and, to a much lesser extent, for companies manufacturing information security products. (Wagner Tr. 189–90; Olhausen Tr. 520; PX–13; PX–118.) *Security* magazine covers such topics of interest to security managers as security hardware, security managerial issues, and training. It also contains articles on information security, at times mentioning firewalls. (Somerson Tr. 426; PX–118 at 17; PX–124 at 7.)

As a result of Checkpoint's efforts, there is strong brand recognition in the "CHECKPOINT" mark and name in connection with physical retail security products. (*See* Dowd Tr. 91.) The "CHECKPOINT" mark and name are, along with plaintiff's proprietary information, among plaintiff's most valuable corporate assets. (Dowd Tr. 91.)

6. *Sophistication of purchasers, sales modes, time cycles, and end-user interaction*

In selling its products, Checkpoint sells almost entirely through its own sales personnel and independent representatives. In marketing its electronic article surveillance ("EAS") systems, its principal product, plaintiff relies on its internal sales force, which consists of approximately 160 sales representative throughout the United States. (DX–22.) Plaintiff's access control products are sold mostly through a system of approximately 150 distributors around the country that sell a wide array of physical security products, such as closed circuit television and alarm systems. (Thorne Tr. 276; Wagner Tr. 171.) Plaintiff's newly launched RFID product is being sold through independent distributors, or VARs. (Upshur Tr. 404–05.) End users often call Checkpoint with support questions. (Wagner Tr. 170–71; Knick Tr. 332–33.) Checkpoint also cross-sells its product lines to existing customers, allowing Checkpoint to build upon already established relationships. (Dowd Tr. 69; Thorne Tr. 286.)

Plaintiff's products tend to serve specialized needs and are often quite costly. The prices and time cycles for sales vary depending on the product and the customer. For example, EAS systems cost, at the lowest level, between $2,000 to $5,000, plus the cost of necessary tags. (Thorne Tr. 260–61, 289.) In the small secondary market, the pricing of used EAS systems ranges from one-fifth to one-half of the original price. (Thorne Tr. 289–90.) Large retailers, such as Dayton Hudson, might spend upwards of $20 million per year on plaintiff's EAS products. (Dowd Tr. 63–64.) The typical sales cycle for plaintiff's EAS products can be relatively brief for small, single stores, but "months, if not years" for large corporations. (Thorne Tr. 277.) The typical sales cycle for an access control system, on the other hand, is 3–4 months, and runs up to a year, though it may occasionally be much shorter. (Wagner Tr. 177.) RFID product projects typically run between $80,000 and $140,000, and the typical sales cycle for plaintiff's RFID products is 3–6 months. (Upshur Tr. 410.)

Checkpoint's Sales Engineer accompanies dealers in meetings with end users of Checkpoint's EAC products. (Knick Tr. 331.) In such meetings, Mr. Knick meets

with corporate security directors, but "increasingly, MIS personnel will be in that meeting because we're now working across the customer's LAN with our Windows based products." (Knick Tr. 331.) Members of MIS groups often question Mr. Knick on the bandwith Checkpoint's products take up on a network and whether the systems can be deployed remotely. (Knick Tr. 334.)

In marketing and selling its products, Checkpoint has few dealings of importance with the information security personnel of a customer. Checkpoint may deal with MIS personnel when there is the occasional need to integrate Checkpoint's computer-based products with the other systems of the end user. (Dowd Tr. 62; Wagner Tr. 217; Thorne Tr. 279.) Additionally, when the sales cycle is slightly longer because of the need to discuss ability to integrate Checkpoint's product with pre-existing products, there is discussion with a customer's MIS department, loss prevention department, operations department, and finance department, all of whom are impacted by the deployment of a security system. (Thorne Tr. 277–78.) The MIS personnel typically become involved with the purchasing decision later in the sales cycle, after plaintiff has been identified as a vendor. (Knick Tr. 353; Wagner Tr. 169–70; Thorne Tr. 278–81.) MIS personnel are sometimes seen as a nuisance and potential disruptor of the sales cycle. (Thorne Tr. 280; Wagner Tr. 169.) MIS personnel are not the ones who "opened the door to Checkpoint to get [them] in...." (Thorne Tr. 306.) As a rule, Checkpoint is not directing its sales pitch toward information security personnel. The customer's concern is instead merely to assure that plaintiff's product, if purchased, does not interfere with the existing computer network.

Nonetheless, Checkpoint occasionally deals with the customer's CIO or MIS personnel (Dowd Tr. 63; Wagner Tr. 217), particularly when Checkpoint's products are used to collect data or transfer the data back to a remote location. (Thorne Tr. 279–80.) For example, Checkpoint recently completed a sale with Kroeger Company. The key negotiator for Kroeger was its CIO. (Dowd Tr. 62–63.) Checkpoint has dealt with the CIO for Dayton–Hudson Corporation (Dowd Tr. 63–64) and has interfaced with the Vice President of Store Information Security for Target (Thorne Tr. 281). Checkpoint also works with other companies to ensure that its product may be integrated with third party products. (Thorne Tr. 290–91.) Two of these companies are NCR (an OPSEC partner of defendant) and IBM. (Id.)

Plaintiff also interfaces with end users of its products by providing classes to help them understand how Checkpoint's product is incorporated across corporate networks for purposes of data integrity production, data backup, and integration with other products. (Knick Tr. 328–29.) Craig Knick has recently taught classes as Exodus Communications in California, Bomabardia Financial in Florida, and Alliance Capital and KBC Bank in New York City. (Knick Tr. 329.) The attendees of the classes include security personnel and MIS personnel. (Id.)

Additionally, there is a "secondary market" or "after market" for Checkpoint's retail store physical security systems. (Thorne Tr. 272.) There is no evidence of an aftermarket for Checkpoint's other products.

### B.  *Defendant and its business*

#### 1.  *History and founding of company*

Defendant Check Point Software Technologies, Inc. ("CPS") is a Delaware corporation with its principal place of business at Three Lagoon Drive, Suite 400, Redwood City, CA 94065, although, like Checkpoint, it has regional offices throughout the United States. (Mitra Tr. 940.) It is a wholly-owned subsidiary of Check Point Software Technologies, Ltd. ("Check Point Software Ltd."), an Israeli company headquartered in Ramat–Gan, Israel.

(DX–54 at 2.) The Israeli parent's stock is publicly traded on NASDAQ. Today, Check Point Software Ltd., which is not a defendant in this case, manufactures products that deliver policy-based solutions for network security, traffic control, quality of service ("QoS"), and IP address management. (DX–54 at 11.)

As explained below, defendant CPS designs and sells a firewall product which promotes and controls the transmission of electronic data from, to, and over the Internet, performing functions such as protecting a local computer network from electronic intrusion by unauthorized users. Such an electronic firewall is a sophisticated and expensive software application which must usually be bought, installed, and maintained by computer network information specialists.

Check Point Software Ltd. was founded in Israel in 1993. (Kramer Tr. 1148.) Two of the founders, Gil Schwed and Shlomo Kramer, had served together in the Israeli army. (Id.) The company's first office was located in a room in Mr. Kramer's grandmother's home. (Id.) Financing opportunities were extremely limited at that time because of skepticism that the Internet would have any serious commercial application. (Id.)

From its inception, the company used the name "Check Point Software." (Kramer Tr. 1158–59.) Mr. Kramer testified that the name was selected in the spring of 1993 in a brain-storming session at which those present were looking for an appropriate name for what they were doing, selecting "Check Point" because, as Kramer testified, "essentially what we are doing is we [scanned] the network, we controlled the traffic, we are sort of the check point. . . ." (Kramer Tr. 1159.) To Kramer, the name suggested the many check points maintained by the British mandate in Palestine before Israel's War of Independence. (Kramer Tr. 1159–60.)

At that time, Checkpoint had been doing business in Israel through a distributor using the CHECKPOINT name for at least 15 years. (Dowd Tr. 81–82.) Nonetheless, Kramer testified that he was unaware of Checkpoint's presence in Israel. (Kramer Tr. 1162.) In any case, he certainly became aware of Checkpoint's existence by 1993 (prior to CPS's use of its name and mark in the United States) through Check Point Software Ltd.'s Internet domain name search for check-point.com. (PX–190.)

Check Point Software Ltd.'s founders started with a vision that the Internet would emerge from its limited use by universities and research institutions to be used by businesses as a global communications network. (Kramer Tr. 1149.) The Internet today is such a global network made up of devices operated by several carriers around the world which provide "pipes" or communication media for data transmittal. (Mitra Tr. 942–44.) Its commercial applications have experienced explosive growth over the last five years. In the beginning of 1995, there were 10,000 to 12,000 websites; today, there are 40 to 45 million websites. (Morency Tr. 1338.)

The company's focus from the beginning was to be "network centric," i.e., to serve the needs of a growing global communications network and to add to network security. Its first software product, a "firewall" (described below), was designed to address the issue posed by a company's private network ("intranet") connection to a very public Internet, while preserving the privacy and integrity of its internal resources. (Kramer Tr. 1149–50.) During 1993, the three founders of Check Point Software Ltd. worked on the development of an improved firewall, and they began hiring full-time employees in 1994. (Kramer Tr. 1155.)

After six months of work, Check Point Software Ltd. had a prototype firewall ready for beta testing in the United States. (Kramer Tr. 1150.) Beta tests were hosted by such corporations as Gillette, Lotus, and State Street Bank. (Kramer Tr. 1162.) This was the defendant's first use of the

Check Point name in the United States. (Kramer Tr. 1160.) By the spring of 1994, Check Point Software Ltd.'s firewall won the award for the best product at the leading network industry trade show, Networld Interop, allowing the company to forge a relationship with Sun Microsystems. (Kramer Tr. 1160–61.) Check Point Software Ltd.'s first firewall sale was a site-license to Sun Microsystems, a pioneer in Internet technology, which soon began to include the product in its Solstice suite of networking products. (Kramer Tr. 1156, 1184–85.)

In 1995, Check Point Software Ltd. established CPS as its United States marketing subsidiary. (Rieman Tr. 1493, 1496.) Deborah Rieman was selected to establish CPS as a viable entity in the U.S.; CPS did not have even a single employee in the U.S. at that time. (Rieman Tr. 1603.) Rieman, who testified at trial, was involved in the decision to use "CHECK POINT" as a mark and name in the United States. (Rieman Dep. 27.)

As of 1995, Sun Microsystems still sold more than 60 percent of CPS's products, under Sun Microsystems' private label, accounting for approximately $ 2 million in U.S. sales. (Rieman Tr. 1604, 1605–06; Kramer Tr. 1181.) Even in 1996, more than 45 percent of CPS's products sold were still private labeled by Sun Microsystems and sold as "SOLSTICE FIRE-WALL–1." (Rieman Tr. 1604; Kramer Tr. 1182, 1184.) CPS began to advertise in the United States under its own name beginning in the spring of 1996. (Rieman Tr. 1607.)

CPS uses "CHECK POINT" as the dominant part of its name (Kramer Tr. 1158–59, 1175; DX–113), sometimes using it as two separate words (Check Point), and less often as a unitary term (Check-Point or CHECKPOINT). (Rieman Tr. 1659–60.) The words "Software Technologies" also appear on CPS's packaging, although in smaller print beneath the "Point" in "Check Point." (DX–113.) It operates its website at the domain www.checkpoint.com. (DX–114(a); PX–131; PX–132; PX–133.)

### 2. Products sold

CPS identifies itself as the market share leader for network security products. (Mitra Tr. 967, 1001.) In 1997, CPS expanded its product line to include computer "network management" products in addition to network security products. (O'Connor Dep. 26.) Its Internet products page lists enterprise security, access control, authentication, address translation, content security, encryption, operating system security, and router management as product functional areas. (PX–132.) CPS continues to claim the "most comprehensive suite of security products you'll find on the market today." (PX–132.) Its products are meant for the corporate world, not for individual or personal computer security. CPS makes no physical security products, and its network security products are software and the technical services required to install or maintain the software in the customer's network.

CPS sells two general types of products—those which perform network security functions and those which do not—although the two types of products are sometimes sold together in bundles.

### a. Products which perform network security functions: firewalls and VPNs

CPS's computer security products prevent unauthorized internal and external entry into the computer networks of business and institutions, and thus allow users to prevent theft of information from computer network systems. (Mitra Tr. 946, 948.) Firewalls serve as an example. A firewall is software that resides at a network's connection point (or points) to the Internet. The firewall analyzes data streams, either allowing or disallowing data to pass based on a series of network security policies or rules. (Mitra Tr. 946; Rieman Tr. 1499–1500.) Charles Breed testified for CPS that the name "Check

Point" is synonymous with firewalls. (Breed Tr. 1421–22; 1444.) CPS's firewall products have received numerous industry awards and have a number of industry certifications, including from the ICSA (International Computer Security Association) and from the NSA (National Security Agency). (Mitra Tr. 986–88; Rieman Tr. 1517–18; DX–53; DX–81.)

Firewalls protect the internal computer network by forcing computer network connections to pass through the firewall, where the connections can be examined and then accepted or rejected based on network access policy rules. (Mitra Tr. 946, 948.) During 1994 and 1995, CPS was a firewall company (Rieman Tr. 1498–1500), of which the FIREWALL–1® was the flagship product (Mitra Tr. 945.) FIREWALL–1® is characterized by CPS as an enterprise security suit that integrates access control, authentication, encryption, network address translation, content security, and auditing. (Rieman Tr. 1626; PX–131.)[2] Although FIREWALL–1® is not sold "shrinkwrapped;" it was the first firewall software product on the market that could be installed without the end-user having to actually write any unique program (Rieman Tr. 1516–17). Firewalls cannot be purchased off the shelf at retail computer stores. A firewall is a highly specialized product. The ordinary network user is unaware of the firewall, its configuration, or its brand name.

Other network security products include CPS's virtual private networking ("VPN") software, designed to facilitate world-wide business communications on the Internet by ensuring privacy for the communications and to prevent them from being intercepted or otherwise compromised. (Rieman Tr. 1504–05; DX–73.) In late 1997, CPS expanded its product line to include "VPN–1," which is computer software that is essentially a firewall with encryption marketed under the CHECK POINT trademark and name. (DX–69; DX–72; Mitra Tr. 950.) The VPN is a natural point from where computer network traffic is controlled and passed on to the appropriate servers throughout the network. (Mitra Tr. 952.) Another VPN product includes "VPN–Gateway," a computer software product which was originally named "Firewall–1 and Encryption Module." (Mitra Tr. 1030.)

In summary, defendant's network security products are technologically advanced pieces of a computer network's internal architecture, which are transparent to the user, whose operation and maintenance are understood only by network information specialists.

### b. *Products which do not perform network security functions*

By 1997, Check Point Software Ltd. was selling network security products which interoperate with FIREWALL–1® but which themselves provide no network "security" functionality. The first such prod-

**2.** The Court also notes that Check Point Software Ltd., CPS's parent company, also created Open Platform for Secure Enterprise Connectivity ("OPSEC"), although OPSEC is not a product. Check Point Software Ltd. created OPSEC in 1996 in order to open CPS's software "architecture"—which then consisted of its flagship network security products—to third parties to enable their network products to be developed in a manner that would allow them to integrate and "interoperate" with defendant's product. (Rieman Tr. 1500.) Interoperability means, from a technical point of view, the ability of two pieces of computer code to work together by exchanging data. (Rieman Tr. 1502.) From a policy standpoint, it means that the user can develop an overall management policy to control how the different OPSEC programs are used together on a customer's computer network, so that the products all function as one multi-faceted system controlled from defendant's common graphical interface ("GUI"). (Rieman Tr. 1502.) This second goal has been one of the most significant features of OPSEC (*id.*), and it has been successful, quickly becoming a de facto network industry standard. (*Id.* at 1501.) Currently, defendant has over 200 OPSEC partners, representing at least that many OPSEC products. (Rieman Tr. 1502; DX–54 at 13.) Some of the products are network security-oriented, while others are network management products. (Rieman Tr. 1501–02.)

uct was FLOODGATE®, which performs "bandwith" management, i.e., it allows a network manager to prioritize traffic between a computer network and the Internet to allow optimal network performance. (Mitra Tr. 972–73; DX–54 at 11; DX–72.) As enterprises began to rely more heavily on the Internet for "e-commerce" business transactions, the bandwith management of the finite "tunnel" that connects the business to the Internet became a critical network management function. (Mitra Tr. 952–53.)

Another product is CONNECT CONTROL®, a "load balancing" product that enables a computer network with multiple computer servers performing identical tasks to intelligently distribute client requests evenly across servers for optimal performance. (Mitra Tr. 973; DX–54 at 11; DX–72; DX–77.) Defendant's OPEN SECURITY MANAGER® software allows the management of "routers" from such diverse manufacturers as Cisco, 3Com, and Nortel (all OPSEC partners) from a client's central network management console. (Mitra Tr. 969–70; DX–72; DX–76.)

### 3. *Percent of revenues*

The revenues of CPS have grown from about $30 million in 1996 to about $210 million in 1999. (Kramer Tr. 1156.) The majority of CPS sales in the U.S. are for network security software products (Mitra Tr. 1004); CPS is known for its network security products—such products dominate its revenues and reputation. (Morency Tr. 1360.) By the time of trial, software in the VPN-series was defendant's leading product (Rieman Tr. 1504; Mitra Tr. 1020), holding a worldwide market share of over 40%. (Mitra Tr. 967.)

### 4. *Major competitors and relative market shares*

By the time of trial, CPS held a market share in VPN technology of over 40% worldwide and more than 70% in Europe and Japan. (Mitra Tr. 967.) As of trial, defendant had more than 100,000 installations worldwide and more than 40,000 customers (Mitra Tr. 965), about one half of which are in the United States.

### 5. *Marketing techniques, advertising, and trade shows*

Ms. O'Connor, CPS's Director of Marketing Communications characterized the business as thus: "We do Internet security software, and we actually have two other product lines." (O'Connor Dep. 26.) She spends 60–70 percent of her time on marketing CPS's network security products. (O'Connor Dep. 69.)

CPS promotes its network security products through trade shows, advertising, educational seminars, and its web site. In the summer of 1999, CPS sent a direct mailer on its VPN–1 product to two of Checkpoint's experts, which touted CPS' array of network security products. (PX–122; McCrie Tr. 760–61; Somerson Tr. 451–52.) Defendant's advertising appears in *PC Week*, a magazine available on newsstands (O'Connor Tr. 1057), and *Network World*, a publication read by Checkpoint personnel (DX–82; Wagner Tr. 231–32; Knick Tr. 336). It also advertises in other computer and networking trade magazines, including *Internet Week*, *Network World*, *Communications Week*, and *Date Communications*. (O'Connor Tr. 1037, 1039–40; DX–82.) Such magazines are chosen because their articles concern defendant's technology and because they reach IT (information technology) personnel. (O'Connor Tr. 1038–39.) The readership of the publications in which defendant advertises does not include security directors or managers (O'Connor Tr. 1060–61, 1064; O'Connor Dep. at 117–18), but does include IT managers, CEOs, and other executive management persons. (O'Connor Dep. 118.) Some of defendant's competitors advertise in other publications, such as *Info Security*, in which some of plaintiff's competitors also advertise and in which CPS has been mentioned. (O'Connor Tr. 1057.) However, neither plaintiff nor its competitors advertise in

any of the magazines in which defendant itself advertises. (O'Connor Tr. 1045–46; Wagner Tr. 230–31.) Conversely, defendant has never advertised in periodicals targeted towards physical security professionals and loss prevention professionals, such as *Security Management,* or specific vertical retail market segments such as *Supermarket News.* (O'Connor Tr. 1039–41; DX–82.)

In addition to advertising, CPS distributes press releases to radio networks, news wires, and publications of general circulation. (Rieman Tr. 1527.) CPS' press releases are available at CPS' home page on the Internet. (Schick Dep. 15.) CPS seeks coverage in publications such as *The Wall Street Journal* and *Barron's.* (O'Connor Dep. 130.)

Defendant and its value added resellers ("VARs") also promote defendant's products at trade shows targeted at the Internet and network security markets. There is no meaningful overlap between the trade shows in which defendant participates and those in which plaintiff participates, reflecting, among other things, the separateness of the two channels. The same audience that reads the magazines in which defendant advertises attends these shows, *i.e.,* network managers and IT professionals. (O'Connor Tr. 1047–49.) These shows include the RSA show, Networld Interop, Internet Expo, and the Internet Service Providers Conference. (O'Connor Tr. 1047–48, 1053; Mitra Tr. 992–93; Loonkar Tr. 1092–93; DX–3; DX–13; DX–83.) Neither plaintiff nor other physical security providers exhibit at these shows (O'Connor Tr. 1049), and none of defendant's witnesses who attend these trade shows has encountered physical security, loss prevention, or facilities personnel at a trade show. (Mitra Tr. 993; O'Connor Tr. 1050; Loonkar Tr. 1093; Breed Tr. 1437; Fish Tr. 1732.) Defendant's employees and VARs were not familiar with ASIS or other physical security trade shows in which plaintiff participates. (Mitra Tr. 985; Loonkar Tr. 1092; Fish Tr. 1733; Kramer Tr. 1165; Lavelle Tr. 1283; O'Connor Tr. 1052.)

6. *Sophistication of purchasers, sales modes, time cycles, and end-user interaction*

Defendant's products are almost exclusively marketed and sold through a network of value added resellers ("VARs") that offer other network security and network management products and services. (Mitra Tr. 958; Lavelle Tr. 1271–72; Breed Tr. 1422.) More than 1,000 VARs sell defendant's products. (DX–114A.) None of these distributors or VARs offers any of the types of physical security or inventory management products either sold by plaintiff or by other manufacturers of physical security products. (Mitra Tr. 960–61; Loonkar Tr. 1084–85; Fish Tr. 1685–86, 1689–90, 1734; Gilley Dep. at 63–64; DX–114A.) All of defendant's VARs are required to have a background in the networking and network communications business, some dedication to network security, and a deep understanding of networking (*i.e.,* routing) technology, including firewalls, VPN, routing protocols, and IP address management. (Mitra Tr. 959–60.) In addition, each of defendant's VARs goes through intensive training on defendant's products so that they know how to configure and deliver turnkey solutions to customers. (Mitra Tr. 958–59.) Each VAR must have at least two certified CPS engineers (CCSE) per location of their business. (Mitra Tr. 960.) Some resellers of CPS's products are not licensed, but sell CPS's products. (Gilley Dep. 18.)

Additionally, defendant sells its products to original equipment manufacturers ("OEMs") of networking equipment such as servers and routers that embed defendant's products in their computer hardware. Defendant's OEMs include major manufacturers such as AT & T, Bay Networks, and Nokia, among others. (Rieman Tr. 1539.)

Defendant's products are very expensive. Customers such as Federal Express

and Coca–Cola typically place multiple orders every year ranging between $40,000 and $100,000. (Mitra Tr. 992.) On defendant's price list (DX–85), individual products ("SKUs") range from $2,995 for a firewall for a single enforcement policy (DX–85 at 9) to $219,995 for the MetaIP Enterprise Suite for 200,000 IP addresses. (DX–85 at 22.) These prices represent only the initial outlay to purchase the products and do not include the cost of the machines and services required to operate the software. These added items increase the cost between three- and five-fold over the cost of the software alone. (Mitra Tr. 991–92.) Although firewalls are becoming less expensive (Morency Tr. 1372; Sherizen Tr. 652–53; PX 100), and the price has not increased since the product was first introduced (Rieman Tr. 1631), defendant's firewall products remain very costly, beyond the realm of routine expenditure for most customers.

Typical customers of defendants' products include, in addition to Coca–Cola and Federal Express, companies such as Home Depot, Goldman Sachs, Merrill Lynch, Solomon Smith Barney, Viacom, Pfizer, Commerce Bank, the Gap, Charles Schwab, 3Com, and Johnson and Johnson; the U.S. Department of Agriculture; NASA; Kansas Bureau of Investigation; the states of Florida, Georgia, and Texas; the governments of Bermuda, Barbados, and Puerto Rico; and the Kansas prison system. (Wagner Tr. 172–73; Mitra Tr. 940–41; Lavelle Tr. 1272; Fish Tr. 1074; Loonkar Tr. 1085.) The purchasers of defendant's products typically are high level members of the end-user's network management team, and include the CIO, Director of Management Information Systems ("MIS"), or Network Security Director. (Kramer Tr. 1162, 1164; Mitra Tr. 991; Loonkar Tr. 1086, 1090; Fish Tr. 1715–16; Stern Tr. 1222.) These individuals usually have high levels of training and expertise in computing and data communications. (Lavelle Tr. 1274–75; Fish Tr. 1715–18; Stern Tr. 1223–24.)

Other customers include smaller companies. The VARs that distribute defendant's products are readily available to provide professional consulting services to them for installation, training, and maintenance. (Loonkar Tr. 1074; Fish Tr. 1714; Mitra Tr. 958–59.) These smaller companies also often retain other consultants for the selection and implementation of network security solutions. (Morency Tr. 1372.) Finally, telephone companies such as AT & T and MCI–Worldcom are entering the market as Internet service providers ("ISPs") and are offering managed security services to end-users; almost all of these companies are purchasing defendant's software products in their network operation centers to provide those services. (Rieman Tr. 1514–15; DX–54 at 11.)

The sales cycle for defendant's products will typically take several weeks for the smaller end-users, but three to four months for larger end-users. (Mitra Tr. 990.) Defendant's products are typically used for a 30–day evaluation period before purchase. (DX–113; Mitra Tr. 980.) Although defendant's product was once purchased in one day, in a crisis following an attack on the enduser's website by a "hacker," that was an aberrational event. (Gilley Dep. at 65–66.) Almost always, such purchasing decisions are careful and deliberate, and there can be no doubt that the customer knows with whom it is dealing.

Once defendant's products are purchased, training is provided, because these software applications are complex and their functions can affect the performance of an entire computer network. A comprehensive and detailed multi-step approach is required in order to properly design, install, test, and finally implement defendant's VPN and other network security and management products. (Loonkar Tr. 1087–89, 1101–02; Lavelle Tr. 1286–88.) In order to be able to operate the software, end-users typically take both CPS courses (CCSA and CCSE) and must

make use of all six thick volumes of the manual. (Mitra Tr. 979; Fish Tr. 1720–28.) The "getting started manual" packaged with the software disk (DX–113) is not enough to install or manage the product. (Mitra Tr. 979.) The GUI of defendant's product suites are becoming easier to navigate once the product is installed (Mitra Tr. 1020–21; Fish Tr. 1729–30; Loonkar Tr. 1103), and some simpler firewalls are becoming easier to manage (Morency Tr. 1371; Sherizen Tr. 649–51; PX–99). Indeed, CPS promotes it products as being "easy to use" (O'Connor Tr. 1068), which is a relative term at best. They would be impossible for even the typical computer-literate person to understand and install without significant training or expertise in networking. The underlying technology is becoming more complex, rendering installation and management of defendant's products more and more difficult with each new version, and making the training that much more important. (Fish Tr. 1730.) Indeed, many enrollees who take the two-day CPS certification courses do not pass (Loonkar Tr. 1082), and one CPS VAR recounted that his company is frequently called upon to remedy defective firewall installations done by other VARs. (Fish Tr. 1727.) Thus, even the expert VARs can have difficulty with these installations.

In short, the persons who actually use defendant's software products are specialists in computer networking applications, who devote time and care to the selection, installation, and maintenance of defendant's network security products.

C. *Though they are major participants in different submarkets of corporate security, the parties are not competitors*

Both Checkpoint and CPS operate in the general realm of corporate security, if that term is broadly defined. Each manufactures products that are not strictly security products as well—plaintiff makes RFIDs, defendant makes bandwith management and network administration products—but both primarily focus on products designed to protect assets in the corporate world, physical items and persons in plaintiff's case, electronic data and network capabilities in defendant's case.

They do not directly compete with each other, for they operate in completely different segments of the broad business of corporate security: in the dominant sweep of their respective spheres, plaintiff focuses on protecting physical assets while defendant focuses on protecting the flow of electronic information. Plaintiff's sphere includes physical security and control of flow of corporate goods and people by deploying EAS, EAC, and RFID products, typically in retail commercial establishments like drugstores and supermarkets. Defendant's sphere includes electronic information security on corporate networks at point of connection to the Internet and within the internal corporate network (intranet). Their respective product offerings are not substitutes for each other, are expensive, specialized and complex, and require highly trained personnel to produce install, and manage. (Loonkar Tr. 1103–04; Rieman Tr. 1515–16, 1551–53, 1557, 1559–61; Mitra Tr. 975–97.) The two parties invariably advertise and promote themselves in different media and trade shows.

It is only if one draws some analogies between physical security and network security in functional terms that these product lines resemble one another in even a remote way. Plaintiff's product may protect access to the physical hardware of a computer, while access to the information on the network serving that computer may be protected by defendant's products. Indeed, several experts testified that there is no commercial chasm between software products that are a part of EAC systems and EAS and asset tracking products. (Somerson Tr. 455–58; Olhausen Tr. 516, 530–32; Sherizen Tr. 619–20; McCrie Tr. 769–770, 793; Johnston Tr. 901–02, 909–10.) Each product is used to prevent theft

of an organization's "assets," again broadly defined, though each protects different kinds of assets. (Somerson Tr. 867; Olhausen Tr. 530; Sherizen Tr. 637.)

In the rather unlikely event that a person considering purchase of a firewall has also heard of the plaintiff, it is possible that such a consumer first hearing of a Check Point firewall could wonder whether that it is plaintiff's product, given that some of plaintiff's products now operate through networks or are software-dependent, meaning that they are operating in systems that may be protected or controlled by defendant's products.[3] It might be logical for a consumer to assume that plaintiff Checkpoint has followed the times and expanded to encompass information and network security as well, notwithstanding the fact that plaintiff has not yet done so, with the exception of encryption products for data (Knick Tr. 354–55; Mitra Tr. 950), instead expanding in its traditional segment of the commercial EAS security world. (Dowd Tr. 126–27; Stern Tr. 1226–28 [acquisition of Meto AG].)

Some physical security companies have expanded in this manner, based on the increase in computer-related crime and corporate demand for an integrated suite of corporate security products. (Sherizen Tr. 653–54.) For example, VASCO, one of CPS's strategic partners, which pioneered patented biometric technology, primarily related to fingerprint verification for physical access control (Sherizen Tr. 657–58; PX–108), has since come to offer computer security authentication devices. (PX–108.) Also, some security industry consultants now consult in the fields of physical security and network security. (Sherizen Tr. 653–54; McCrie Tr. 831–32.) The DSFX security consulting firm of Philip Stern claims to deal with Protection of Critical

Assets: Intellectual Property, Physical Security, and Computers and Telecommunications. DSFX handles both physical security and network security investigations. (Stern Tr. 1257.) Gateway Group, Inc., a consulting company, advertises physical security as part of an overall computer and network security plan. (Loonkar Tr. 1136–37.)

On January 4, 1999, the Kroll–O'Gara Company, known for physical security risk mitigation, acquired Securify, Inc., an information security consulting firm. (Breed Tr. 1428.) The acquisition created a firm offering physical security and network security strategies and services. (PX–151.) The V.P. of Kroll O'Gara's Information Security Group noted the motivation for the purchase:

> Well, Kroll O'Gara's business has been primarily what we refer to as just the physical industry or physical space of security, and they saw the enormous growth rate and opportunity for information security, and they figured that that would be a good business for them to get into, to add to their existing physical security business.

(Breed Tr. 1426.) Kroll O'Gara promotes the physical security expertise of its principals and physical security services as a component of the information security services it renders. (Breed Tr. 1431.) Kroll O'Gara ISG's marketing brochure advises that it can assist a client in having information security and physical security work together in a total corporate security system. (Breed Tr. 1458–62, 1465; PX–150.) Kroll O'Gara's other marketing material is consistent with its brochure, noting, for example, in its website, that in designing an information security strategy, physical security and physical site inspection are two of the design issues. (PX–164.) Kroll

---

**3.** This does not mean that plaintiff is actually operating in the information or network security segment of the corporate security world. Were that true, just through the mere use of computers (like telephones and electricity), the vast majority of businesses in the U.S. would be "converging" with the computer business. For that reason, the United States Patent and Trademark Office has recognized that products are not to be considered related just because they use or interface with computers. *See Viacom Int'l Inc. v. Komm*, 46 U.S.P.Q.2d (BNA) 1233, 1238, 1998 WL 44545 (T.T.A.B.1998).

O'Gara also promoted both its physical security and information security services at the 1999 conference sponsored by ASIS, the largest international organization for security professionals, which over 10,000 people attend annually. (McCrie Tr. 776–79.)

However, very few players in the corporate security realm have integrated physical and network security in this way, and, in fact, Kroll O'Gara's venture into this area has been largely unsuccessful. Kroll O'Gara had hoped that the acquisition of Securify would increase its revenues by two- or three-fold, but instead "missed [its] third quarter number pretty substantially ..." (Breed Tr. 1442), and as of the time of trial, Kroll O'Gara was up for sale and it was expected that the company's separate pieces would be spun off on their own (Breed Tr. 1443), because the joint consulting project was unsuccessful. Its lack of success was not for lack of promotion; it was due to the realities of the corporate security marketplace, in which such globalized "corporate security" solutions appear to have gained little or no acceptance, since customers having computer network security needs appear to prefer specialized computer security companies and consultants.

Of course, the physical computer room and computers, like any other place or item, may have controlled access, to allow only authorized persons to enter. (Somerson Tr. 458; Olhausen Tr. 530–32; Sherizen Tr. 637; McCrie Tr. 793.) Given this reality, it is possible that a computer room specialist could have his or her access to the space controlled by plaintiff's access device, while working on a network that has defendant's firewall protecting information flow. No such person has actually been identified, not surprisingly, given the small volume of plaintiff's access control (EAC) sales.

The parties' consumers are largely different (defendant makes its sales pitches to MIS and IT personnel, while MIS and IT personnel only become involved with plaintiff late in the sales process after plaintiff has been identified), they advertise in different media, the sales cycles of both parties' products are long, the prices are high, and the end-users, for the most part, are experienced professionals trained in very different fields.

It is therefore highly unlikely that any customer will consider buying or ultimately buy defendant's products under the incorrect belief that plaintiff is the source of those products. Indeed, as discussed below, the record developed over the four years that this case has been pending contains no evidence that defendant actually received a single sale as a result of confusion. Nor is it likely that plaintiff will ever enter the network security field; as defendant's expert John Morency explained, there are enormous technological barriers for any company not already in the network area to be overcome to enter the firewall business (Morency Tr. 1351–52), and plaintiff's CEO testified that plaintiff has never considered acquiring a company in the same business as defendant's. (Dowd Tr. 126.)

As the following evidence indicates, while it is possible that a consumer could be initially confused, that possible confusion is superficial at best, is quickly and easily remedied, and is highly unlikely—to the point of being impossible—to result in a purchase of defendant's network security software based on a mistaken assumption of identity of the product's source.

### D. *Instances of actual confusion*

Though there is some evidence in the record of temporary initial confusion between the companies by experts, the media, investors and consumers, there is no evidence of actual customer confusion in connection with the purchase of defendant's products. There are anecdotes involving initial or superficial confusion between these companies, including persons who reached one company by telephone and (very rarely) e-mail when they intended to reach the other. For example, sev-

**448**

eral experts testified that they were confused as to affiliation between CPS and Checkpoint based on the near identity of the names and the relationship between the different segments of the security industry. (Johnston Tr. 886–88; Ohlhausen Tr. 485–86; Sherizen Tr. 641–42.) [4] Plaintiff Checkpoint has received numerous e-mails intended for CPS or about firewalls. (PX–18; PX–139.) [5] Several customers have allegedly asked Checkpoint representatives, such as Checkpoint's C.E.O. (Mr. Dowd), [6] Mr. Knick, [7] and John Thorne, [8] expressing some interest in firewalls.

4. David Johnston said that he believed that Checkpoint had entered the firewall business. In February of 1997, Mr. Johnston, of the physical security department of the Educational Testing Service, was in discussions with Checkpoint concerning Checkpoint's EAS devices. When he mentioned Checkpoint to his counterpart in the computer security department, the Manager of Computer Security said that ETS was purchasing a "Checkpoint Firewall." Mr. Johnston replied that "he didn't realize that Checkpoint was in that business." (Johnston Tr. 887.) Johnston, however, was not involved in ETS's decision to purchase defendant's firewall, and there is no evidence that ETS thought it was purchasing plaintiff's product. Dr. Sanford Sherizen, also retained by plaintiff, said that he did not realize there were two separate Checkpoints in the corporate security industry until he was engaged in this case as an expert in mid-March 1997; he just assumed that there would not be two different companies operating under the same name selling security products. (Sherizen Tr. 641–42.) Peter Ohlhausen, another retained witness for plaintiff, testified that when he first encountered CPS, thought CPS was Checkpoint's software division because he knew that Checkpoint had more than one division. (Ohlhausen Tr. 485.) The Court does not place much weight in these anecdotes. In any event, no witness said his ignorance of defendant's existence lasted for long, nor did any person take meaningful action under the mistaken belief of dealing with the other company.

5. Among these e-mails are requests for information on operating Checkpoint's firewall. PX–139 is an e-mail sent to Checkpoint requesting a price quote on a Nokia IP440 product integrated with a Checkpoint Firewall II. (PX–139.) The e-mail was sent to *sinfo@nj.checkpoint.com*, not a *www.checkpointsystems.com* address. (PX–139.)

6. When Dowd met with the Vice Chairman of Dayton Hudson Corporation in early October 1999, Dowd was asked "you're not the firewall company, right?", and he confirmed that Checkpoint was not the firewall company. (Dowd Tr. 76.) Mr. Dowd was approached at the National Retail Federation Show by the head of security for Barnes and Noble about Checkpoint's entrance into the firewall business. (Dowd Tr. 72.) Checkpoint's former V.P. of Marketing said that he received telephone calls from persons in the financial community and the security industry who believed Checkpoint manufactured and offered for sale a firewall product. He was also asked to speak at a computer convention in Philadelphia about Checkpoint's firewall product. (Martino Dep. 27, 34.)

7. Representatives from Exodus Communications, a Checkpoint customer, recently asked Mr. Knick whether Checkpoint's access control systems had to be used with Checkpoint's firewall or whether it could be used with any firewall. (Knick Tr. 339.) Mr. Knick was asked similar questions by persons from Seaman's Power Transmission Group in Raleigh, North Carolina and Bayer Pharmaceuticals in Connecticut. (Knick Tr. 339–40.) Bayer is one of Checkpoint's largest customers in the U.S. (Knick Tr. 340.) Knick said that he has also been approached by persons at trade shows concerning Checkpoint's non-existent firewall product. (Knick Tr. 338–40.) He said that he recently received a telephone call from a representative of V One Systems, concerning employment, because the caller though Mr. Knick was a firewall expert. (Knick Tr. 341.) These hearsay anecdotes are not documented other than in Mr. Knick's memory, and they are not entitled to much weight.

8. When John Thorne was with Checkpoint, he was allegedly contacted by "Detection" concerning integration of Checkpoint's products and asked for detail on Checkpoint's firewall products. (Thorne Tr. 294.) He frequently received calls from persons in the industry who thought Checkpoint was a firewall provider. (Thorne Tr. 294–95.) He was also asked, during discussions with potential customers and after the initial selling process, why Checkpoint got into the firewall business and how Checkpoint's firewall can be integrated with its EAS system. These undocumented conversations are of doubtful origin in this Court's view. None has been substantiated by the testimony of the Checkpoint customer or other person who was allegedly confused between the two companies.

Checkpoint has received service calls for CPS's products (Knick Tr. 341), and some users of Checkpoint's EAC systems have called CPS for product assistance for EAC systems sold by Checkpoint. (Pringle Dep. 9.) Likewise, receptionists at CPS have received misdirected calls from customers and potential customers of Checkpoint (Irwin Dep. 11–3; Pringle Dep. 9), and, in 1998, CPS' web publisher received at least six inquiries that were intended for Checkpoint, CPS's inside sales manager received an unidentified number of telephone calls intended for Checkpoint, and CPS's former V.P. of Services received at least one telephone call intended for Checkpoint. (O'Connor Dep. 7–10; O'Connor Tr. 1056–57.) CPS's Territory Manager for New York, William Lavelle, admitted that he receives approximately three calls per year for Checkpoint. (Lavelle Tr. 1283.) Additionally, various financial reports and analyses, presumably read by customers and potential customers of Checkpoint, evidence some initial confusion by investors and the media. (Dowd Tr. 78–79, 81.) [9]

What is missing from plaintiff's evidence is any testimony from one of these allegedly confused customers or potential customers, or any other memorialization, such as by a customer's letter, giving a clue to the mental process of the inquirer. Plaintiff has not surveyed its customers or even its sales force on the extent or origins of such "confusion," so far as the record reflects.

As defendant has pointed out, many (but not all) of the phone calls are nothing more than wrong numbers given out by the operator; certain individuals knew specifically that they were trying to contact one of the parties but accidentally reached the other because they were given the wrong number. Moreover, the number of e-mails, telephone calls, and questions pale in comparison to the thousands of telephone calls and e-mail messages plaintiff and defendant receive each month.

Moreover, there is an absence of any evidence that shows or suggests that a single sale of either party's products has been affected or influenced by the name similarity at issue here. The evidence at trial was, in fact, uniformly to the contrary. Not one of the wrong numbers or misdirected e-mails turned into a sales opportunity for the receiver's products. There is no evidence that anyone has come upon defendant's software or has seen defendant's name on the GUI network control panel and thought it was created by plaintiff. Indeed, in most enterprises, only very few network security managers would have access to the computer screen on which defendant's name would appear, for security reasons (Rieman Tr. 1506–07), and even then the defendant's name appears fleetingly as the network system is

9. An October 16, 1998 article at the Internet web site of *Smart Money* magazine, "Will the Real Check Point Please Stand Up?," reported a jump in the stock price of Checkpoint of unusually heavy volume when CPS announced higher than expected earnings. No news on Checkpoint justified that jump in the stock price. (Dowd Tr. 88.) Checkpoint's stock has traded at unusually high volumes on other occasions when information was released on CPS. (Dowd Tr. 88.)

When Dowd gave a presentation to institutional shareholders in Boston, a State Street Research representative told Dowd that he was looking forward to Dowd's discussion of competitors in the firewall industry. (Dowd Tr. 73.) Mr. Dowd testified that this type of situation has occurred many times over the last four or five years. (Dowd Tr. 73.) When Dowd was questioned by Neil Cavuto during alive television interview on March 13, 1997 on Fox News business news, about Checkpoint's firewall product, he had to correct the interviewer on national television that Checkpoint did not have any products in that area. (Dowd Tr. 77.) In 1997, he also received a letter from the Executive V.P. of the Computer & Communications Industry Association, asking him to speak on a panel about Microsoft's investment strategy and the implications for computers and communications companies. (Dowd Tr. 74; PX–17.) In several instances, the stock symbol of Checkpoint has been mistakenly substituted for the stock symbol of CPS, and vice versa. (Dowd Tr. 85; PX–16, 19.) Both Checkpoint and CPS are each listed in the "Mallon Global Security Stock Table." (McCrie Tr. 765–66; PX–35; PX–36.)

uploaded or maintained. The actual existence of defendant's product on a network carries a low profile, consistent with good network security practices.

From the extensive record in this case, then, this Court has gathered an analyzed each allegation of some type of "confusion" between the names or product lines of these companies. The Court is left with the clear impression, and finds as a fact, that no customer or potential customer for defendant's products has believed, to any meaningful degree, that the products originated with the plaintiff. Conversely, of the few customers of plaintiff, or other persons in the media, who momentarily thought plaintiff might have entered the firewall business, not one took any meaningful action while under that mistaken belief.

### E. *The corporate security environment*

At trial, plaintiff argued that in the corporate security environment, the different segments of physical and network/information security are converging, and defendant argued that they are diverging. The record contains evidence supporting both positions. In many ways, the work of information security professionals requires great training and the decisions to purchase network security products are almost exclusively made by MIS and IT personnel, without input from physical security personnel. Physical security personnel do not attend information security trade shows and do not advertise in network security publications. Network security specialists do not attend physical security trade shows. Based on the facts found below, overall the Court finds that there is almost no overlap between the physical and network security segments, and that overall the marketplace for defendant's realm of network security (which is experiencing explosive growth and specialization) is diverging from the physical security marketplace. Consequently, it is highly unlikely that defendant's customers

will even have heard of plaintiff, much less believe they are buying plaintiff's product.

#### 1. *Evidence of convergence of physical and information security markets*

There is some evidence of a convergence between physical and information security, principally to attempt to acquaint physical security professionals with some of the basics of computer network security. Some articles advocated the creating of partnerships between security managers and the MIS department. (*See* Johnston Tr. 907–08; PX–127; Sherizen Tr. 630–31; PX–95 [newsletter from the Technology Risk Consulting Services consulting practice of PricewaterhouseCooper which noted that "[i]n the future, physical security and network security will simply be ... security....The management of risk will not exist on two fronts, rather on one united and integrated front."].) Indeed, sometimes partnerships are formed among security industry consultants with different areas of expertise. (Somerson Tr. 448.)

For example, when a company hires plaintiff's experts Ira Somerson and Philip Stern to make corporate security recommendations, they often draw together teams of specialists and facilitates cooperation among different departments of their clients, including MIS department, security, and the facilities manager. (Somerson Tr. 448–49; Stern Tr. 1210.) Defendant's expert John Morency agreed that IT managers should be involved in the purchase decision of any networked products. (Morency Tr. 1378.) In smaller companies with no MIS or corporate security departments, the contact is typically a general corporate officer, or the customer will employ consultants to help implement security measures. (Fish Tr. 1746; Thorne Tr. 320.) There is no evidence, however, that a company interested in network security would employ a physical security consultant, although it is possible that a non-MIS specialist (such as a company's financial officer) would be involved in purchase deci-

sionmaking for network security products (Fish Tr. 1746), or that an IT manager would operate beneath a corporate security director in a company's power structure.

Other evidence that the marketplace is following this prediction of convergence is hard to find. As already explained above, the parties do not advertise in the same magazines and same trade shows. Nonetheless, plaintiff presented some evidence of some overlap between the marketing and advertising channels of the types of products which plaintiff and defendant carry. (*See* Ohlhausen Tr. 480–81.) ASIS's monthly magazine, *Security Management,* has recently published articles on firewalls and other computer security issues. (Stern Tr. 1259–60; PX–60; PX–113; PX–115; PX–116.) These articles were of the level of generality more typical of a news item, rather than, for example, performance specifications or evaluations. Its "Marketplace" section published two brief product releases for network security products in an issue in 1996 (Wagner Tr. 228), although none of the companies featured actually compete with defendant's product (Sherizen Tr. 699) and the one company featured of which defendant had heard is no longer in business (Rieman Tr. 1648–49). CPS's OPSEC partner, Security Dynamics (now RSA) has had a presence in that magazine. (Ohlhausen Tr. 505.) Sensormatic, plaintiff's competitor, has infrequently advertised in *InfoSecurity,* a magazine for the information security trade which also contains features on physical security products for computers (such as disk drive locks). (Sherizen Tr. 659–60; PX–102.) These are, at best, attenuated and practically coincidental overlaps among or between other companies' advertising choices, notable more for their paucity than their frequency. The same logic might conclude, for example, that two strangers must know each other because they each have cousins who attend the same school.

Publications in both the physical security realms and network security realms have experienced a bit of cross-over in readership. In one survey, 66 percent of readers of *Security Management* identified physical security as a security area of interest to them in their profession, while 47 percent also identified "computer security" (PX–52), (although that broad term was defined and could be thought to have meant the physical experts of protecting computers). In another survey, *Information Security* 's subscriber profile showed that 10,294 respondents were responsible for the purchase of firewalls, 5,733 were responsible for the purchase of physical security products (again broadly defined), and 2,090 were responsible for the purchase of environmental controls. (DX–65.) Likewise, various newsletters on investing in the global security industry, such as *Security Investing,* and directed to security-oriented managers and directors of corporations and institutions, such as *Security Letter* and *Security Journal,* have also discussed both physical and information security for their investor readership. (McCrie Tr. 738–44, 765–66; PX–35; PX–36.) CPS's own marketing material and the marketing material of its VARs recognize that physical access to computers needs attention in addressing network security (Rieman Tr. 1644); at least two of CPS's VARs include security audits as a component of a network security audit. (Loonkar Tr. 1133–35) However, as mentioned above, not one of CPS's team of VARs offers a physical security product.

Various security books and seminars have covered both physical and information security. For example, an ASIS course book handed out at an educational seminar in May 1998 includes a chapter entitled "Information Protection." (Johnston Tr. 874, 903–04; PX–110.) A seminar sponsored by the MIS Training Institute directed to corporate security and MIS personnel covers electronic access control, physical security, and computer network security, including firewalls. (Sherizen Tr. 592–97; PX–103.) The 1997, 1998, and 1999 ASIS conferences offered seminars

on understanding, evaluating, and choosing firewalls and other computer security issues. (McCrie Tr. 778, 779, 781–82; PX 37; PX 90.) The Information Systems Security Certification Consortium spends almost a full day covering physical security for computers, out of eight days in its seminar preparing information security professionals for the Information Security Systems Professional ("CISSP") certification exam. (Sherizen Tr. 584–87.) Additionally, one of the core courses in the B.S. degree program in "Security Management" at John Jay College of Criminal Justice ("John Jay"), which prepares students for careers as security managers and consultants, is "Security of Computers and Their Data," which includes the topic of network security and physical security and a discussion of physical security and managerial issues as well as the various complexities relating to intranets, LANs, and Internet issues. (McCrie Tr. 728, 735–36; PX–32; PX–32.)

However, the physical security portions of information security training, and the information security portions of physical security training are minimal when compared to the main focus of their fields, and much of the overlap focuses only on the need to physically secure the hardware of computers, disks, and the like, and controlling access to rooms housing network equipment. Information security issues make up only one core class in the John Jay program. Some of the *Security Management* articles about information security have done nothing but remind readers of the need for physical security protecting the physical hardware of networks, for example by controlling physical access to the room housing network servers. (Ohlhausen Tr. 514; PX–115.) The chapter which plaintiff's expert Ira Somerson wrote in the book *Computer Security* concerned physically protecting computer data centers. (Somerson Tr. 427.) Although this evidence shows some interrelatedness of the subfields of physical and network security, it hardly shows that the subfields are

converging into just "security," despite some predictions discussed above.

As seen above, such publications and seminars are principally for physical security personnel who wish to learn about computer security. There is little activity in the opposite direction, of information security professionals learning about physical security, as next discussed.

### 2. *Evidence of divergence and specialization*

Although there is minimal evidence of convergence to one field of security, the weight of the evidence indicates that, if anything, the fields are diverging as network security becomes more and more specialized, and the interrelatedness of Internet and intranets becomes more complex. The two segments of the corporate security industry have different trade shows and organizations. Defendant's witnesses who interact with end users, including defendant's VARs, who typically meet with as many as 15–20 end users per week (Loonkar Tr. 1086, 1089–90), testified that they have never encountered any employee (executive or otherwise) who had any responsibility for physical security or loss prevention at any point in the sales process or at any trade shows. (Mitra Tr. 991, 993; Kramer Tr. 1164; Lavelle Tr. 1275; Rieman Tr. 1543; Fish Tr. 1708.) Also, although computer security may be covered at physical security trade shows and in traditionally physical security-oriented magazines, essentially no one in the information security world attends those trade shows or reads those magazines. Neither CPS nor any of its witnesses have attended physical security seminars or trade shows, and computer security trade shows do not cater to physical security concerns and needs.

For example, although ASIS is the largest international organization for physical security professionals (Somerson Tr. 446; McCrie Tr. 776), and though 47 percent of readers of ASIS's magazine identified "computer security" as an area of interest

to them in their profession (PX–52), there is no real evidence to suggest that any of the organization's members is an IT or networking professional, much less a purchaser of one of defendant's products. Even *Security Management*'s readership profile questionnaire did not have the reader identify what security products and services he/she was purchasing, nor did the questionnaire, in asking what security products or services he/she purchases, list firewalls, VPNs, encryption, or any other network security product or service as choices. (PX–52.) The computer security companies that did place product placements in corporate security publications were not the industry leaders, such as defendant, Cisco, or Axent Technologies. Likewise, none of the several thousand companies identified as exhibitors at the ASIS conference were familiar to defendant's employees, much less cognizable players in the network security industry. (Mitra Tr. 985; Fish Tr. 1733.) Only a handful of the nearly 140 sessions each at the 1998 and 1999 ASIS shows are in the "Information Security" category, and none addressed firewalls, virtual private networking, or other network security/management issues; one covered risk management in the developing Internet/Intranet, and others focused on Y2K issues, monetizing the value of proprietary information. (PX–120.) Dr. McCrie acknowledged, however, that ASIS seminars are brief, superficial surveys of subjects which might be of general interest. (McCrie Tr. 810–11.)

There is little overlap in purchasers. There is a trend among larger corporations to develop dedicated network security departments whose officers are responsible for purchasing and implementing network security solutions such as defendant's VPN 1 products. (Rieman Tr. 1541; Fish Tr. 1716.) Kroll O'Gara, plaintiff's prime example of the supposed convergence of physical and network security consulting practices, for example, may have both information and physical security groups, but they deal with different individuals within a corporate structure: the information group typically sells to the CIO, network administrator, or Chief Network Security Officer, and it is the CIO who typically approves the budget for consulting services; the traditional security and investigations divisions sell to the CFO or Chief Counsel of an organization, according to Kroll O'Gara's Charles Breed. (Breed Tr. 1432.) Moreover, the evidence, discussed *supra*, confirms that Kroll O'Gara's undertaking to offer both network and physical security consulting was largely a failure, falling far short of expectations and resulting in Kroll O'Gara's attempt to spin off its different pieces separately. (Breed Tr. 1442–43.) Smaller corporations, such as the Gateway Group, do not even provide physical security consulting services. (Loonkar Tr. 1137–38.)

Though physical security companies may interact with MIS personnel as a part of their sales process, information security companies typically have not encountered physical security personnel in their sales process. (Mitra Tr. 991–93; Kramer Tr. 1164; Lavelle Tr. 1275; Rieman Tr. 1543; Fish Tr. 1708.) This includes defendant's VARs, who typically meet with as many as 15–20 end-users per week. (Loonkar Tr. 1086, 109–90.)

If the fields were converging, one would expect that plaintiff, Sensormatic, or any of its competitors at least would have joined defendant's OPSEC, bundling its physical access products with a VPN or firewall. That neither plaintiff nor any of its competitors has done so (Rieman Tr. 1555–56) speaks volumes about the lack of convergence; neither plaintiff nor any of its competitors provides any functional element of the network infrastructure. There is no company operating today which markets products in both physical security and information security fields. (Stern Tr. 1228; McCrie Tr. 825–26; Fish Tr. 1734.) Given that use of defendant's products requires specialized training, de-

scribed *infra* in Part III.E.4, it is unlikely that any will do so. Defendant has no plans to expand into the physical security realm, either, given CPS's move towards VPNs and general Internet connectivity. (Rieman Tr. 1551–52; Fish Tr. 1735; Morency Tr. 1340, 1258–59; Stern Tr. 1226.)

Moreover, as discussed above, few suppliers exist in both the physical and network security environments. Defendant's VARs do not sell physical security products and plaintiff's VARs do not sell network security products. The "twain" is not "meeting" in the real world of institutions concerned with network security.

### 3. *Lack of generality regarding purchasers*

It is not possible to make a general characterization, finding that all organizations are integrating network and physical security together or that none are. The reality is that in some organizations the same people responsible for purchasing network security products also are involved at some point in the purchasing decisions for physical security and access products, and in others decisions are handled by completely different departments.

At trial, plaintiff presented evidence of various companies with integrated physical and information service functions. For example, plaintiff's expert David Johnston is Director of Corporate Security for the Educational Testing Service ("ETS"), the largest academic testing service in the world. (Johnston Tr. 876.) His job responsibility is to "protect[ ] the assets of the corporation, which include the intellectual, the physical and the personnel of the corporation." (*Id.*) He sits on ETS's computer security committee, which meets to discuss information technology and information security matters for the corporation, with the Manager of Corporate Security. (Johnston Tr. 877.) Despite this seeming integration, however, ETS purchased firewalls without Johnston knowing about it at the time, as discussed above.

Other companies address corporate security in the same fashion as ETS. When Steve Wagner, Checkpoint's V.P. of Access Control, deals with purchasers of Checkpoint's EAC products, he deals "almost exclusively" with committees which consist of a security person and/or facilities person and/or an IT person, with three people involved at a minimum. (Wagner Tr. 176.)

Not all companies have integrated. Several of defendant's witnesses testified that they were not aware of any MIS or IT officer who reported to a "corporate" security or physical security officer or director, or any MIS person who was involved in the purchase of any physical security system. (Mitra Tr. 997; Loonkar Tr. 1090–91; Fish Tr. 1719–20.) Many organizational structures of large end-user customers, such as The GAP, Hewlett Packard, the Kansas Bureau of Investigations, and Sprint, have MIS departments and physical security departments that are totally unrelated, sometimes actually being located in different towns. (Loonkar Tr. 1091; Fish Tr. 1707–08.)

### 4. *Specialization of skills*

Purchasers of CPS products have at least a bachelor's, if not a master's degree in either a technical or some management discipline. (Morency Tr. 1343.) As described above, purchasers of firewalls and other network products typically have a background in computer networks and receive intensive training for the installation and management of network systems software. Physical and corporate security officers generally do not possess that background and necessary training.

As stated above, plaintiff did present evidence that there have been numerous articles and seminars for corporate security personnel and managers regarding computer security. These contain only superficial treatments of highly complex technical subjects (Mitra Tr. 982–83; Rieman Tr. 1563–64; Fish Tr. 1731–32), and they might be sufficient to generally familiarize readers who have no technical back-

ground with the importance of network security. These articles and seminars prepare corporate security officers to generally understand what information security means, which is helpful if they are working with or overseeing information security personnel. These articles and seminars do not, however, prepare their readers and listeners to select, install, and manage complex network security solutions such as VPNs. (Mitra Tr. 982–83; Fish Tr. 1731–32.)

Indeed, even plaintiff's expert witnesses, who are alleged to be on the forefront of the "corporate security market," did not truly understand defendant's business, including firewalls. Dr. McCrie, whom plaintiff has cited for the claim of market convergence, in his testimony mistakenly thought that a networking magazine's reference to intrusion detection scanning was the same as scanning supermarket or drug store inventory at a check-out counter (McCrie Tr. 789), rather than software that scans data communications streams on a computer network to analyze patterns in an effort to detect hacker activity (Rieman Tr. 1573–75, 1672.) Likewise, plaintiff's expert Ira Somerson firmly opined that plaintiff and defendant "both do the same thing" (Somerson Tr. 457, 844), and plaintiff's expert Peter Ohlhausen, a journalist, could neither specify a single development in the firewall area nor interpret any of the technical terms in the product announcements from *Security Management* magazine that he had cited in his direct testimony. (Ohlhausen Tr. 538, 542–43, 560.)

That specialized skills are needed for network security and are lacking in physical security specialists is exemplified by the fact that there are unfortunately many unemployed physical security professionals (Somerson Tr. 861) and a critical shortage of trained MIS professionals. (Morency Tr. 1343.) The unemployed physical security specialists have not filled the void in MIS positions because their education, skills, and experiences are not transferable to network security.

5. *Tendency of physical security toward protection of information, including network security*

Ultimately, the Court finds that, with respect to computer assets, the two fields of corporate security are only weakly related. In this vein, one segment protects computers and data networks, monitors operators, and controls physical access. The other is lodged within the network architecture, invisible to the user, protecting the flow of information inside the computer network system once someone is allowed access to that computer and network altogether.

One example of a somewhat integrated product is the "smartcard," such as the SecurID 3100 product recently introduced by RSA Data Security, an OPSEC partner of CPS. (PX–163; PX–168.) Charles Breed identifies RSA as one of the "movers and shakers" in the information security segment of the corporate security industry (Breed Tr. 1436), a provider of "information security technology, such as cryptographic libraries, and tool kits" and "token cards that give you access onto a network called the SecurID, and AceServer products." (Breed Tr. 1445.) RSA's SecurID 3100 smart card provides both computer network authentication and access and physical access to physical premises. (PX–168.) RSA's press release of October 26, 1999 states that "[i]n addition to serving as a secure, portable PKI credential store, the RSA SecurID 3100 is designed to be used as an employee badge and building access card, reducing the number of cards an individual needs to carry around." (PX–163.) The SecurID product does not bundle internet and physical access, and can be used, for example, to store cash for financial transactions or to store medical records. (Fish Tr. 1736–38; Rieman Tr. 1567–68.) However, the smart card is adaptable to combining physical and computer access, sim-

ply through the placement of a magnetic strip on the card programmed to be compatible with a particular access control system. (Fish Tr. 1740–41.)

The product is not particularly successful (Mitra Tr. 1016, 1022–23; Breed Tr. 1448–49), but its existence signifies a possible point of overlap of physical and network security through bundling, which the Court has considered. The appearance of such convergence in a particular product is superficial, and this RSA product appears in the EAC field in which plaintiff is not well-known.

Overall, in the network security segment, there is little need for the input of physical security personnel. Even though some physical security products utilize the network to convey information, the applications function no differently than the many other uses of a computer network that have nothing to do with security. That the physical segment has use of computers does not cause it to be related to the segment which runs the network's infrastructure. The convergence exists only in physical's security's gradual inclusion of the typical purchasers of network security products in the purchasing and sales cycle of physical security products that must run on the customer's network, rather than vice versa. The lack of acceptance in the marketplace for global solutions and devices integrating physical and information security functions also suggests that marketplace convergence is more theoretical than real.

## IV. CONCLUSIONS OF LAW

### A. Liability for Infringement and Unfair Competition

■ This case involves claims under the Lanham Act for trademark infringement under 15 U.S.C. § 1114 and unfair compe-

tition under 15 U.S.C. § 1125(a). To prove trademark infringement, a plaintiff must show that (1) the mark is valid and legally protectable; (2) the mark is owned by the plaintiff; and (3) the defendant's use of the mark to identify goods or services is likely to create confusion concerning their origin.[10] *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994). In this case, defendant did not dispute that plaintiff established the first two requirements,[11] and the evidence at trial therefore focused on the third requirement, likelihood of confusion as to the source of goods and/or affiliation of companies in connection with any goods or services. The applicable standard is not possibility of confusion, but rather likelihood of confusion. *See Genovese Drug Stores, Inc. v. TGC Stores, Inc.,* 939 F.Supp. 340, 345 (D.N.J.1996) (applying likelihood of confusion test where plaintiff and defendant did not compete in the same field).

■ To establish likelihood of confusion, a plaintiff must prove that " 'consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.' " *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 292 (3d Cir. 1991) (quoting *Scott Paper v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978)). *See also Fisons,* 30 F.3d at 472 (quoting *Dranoff–Perlstein Assoc. v. Sklar,* 967 F.2d 852, 862 (3d Cir.1992)). Plaintiff's required showing of proof on the likelihood of confusion issue depends on whether the trademark owner and the alleged infringer deal in directly competing products. Where, as here, they do not, the Third Circuit has adopted the following ten-factor test to determine the likelihood

---

**10.** These standards apply to claims brought under both 15 U.S.C. § 1114 for trademark infringement and 15 U.S.C. § 1125 for unfair competition. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 473 (3d Cir. 1994).

**11.** These requirements are met where plaintiff's mark has been federally registered, in continuous use for five consecutive years, and is not subject to a proceeding challenging the mark's validity. *Fisons,* 30 F.3d at 472 n. 7.

of confusion in the marketplace as to a product's source:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Fisons*, 30 F.3d at 473; *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d at 1231. None of these factors is determinative, and each must be "weighed and balanced one against the other." 3 *McCarthy on Trademarks and Unfair Competition*, § 24:30 (4th ed.1996); *see also Fisons*, 30 F.3d at 476 n. 11; *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d at 1231. The Court will apply the law regarding these factors to the facts of this case.

### 1. Similarity of Overall Commercial Impressions of the Marks

■ "Similarity of the marks is merely one of the relevant factors, and it is not dispositive on the issue of likelihood of confusion." *Harlem Wizards Entertainment Basketball, Inc. v. NBA Properties,*

*Inc.*, 952 F.Supp. 1084, 1096 (D.N.J.1997). *See, e.g., Lang v. Retirement Living Publishing Co.,* 949 F.2d 576 (2d Cir.1991); *Astra Pharmaceutical Prods. v. Beckman Instruments, Inc.* 718 F.2d 1201 (1st Cir. 1983) (no likelihood of confusion for use of ASTRA for different types of medical equipment and health related products). However, of all of the ten factors, "[p]erhaps the most important is the degree of similarity between the two marks." *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d at 293.

■ Plaintiff contends that defendant's use of the words "CHECKPOINT," "CheckPoint," and "Check Point," whether or not accompanied by "Software Technologies, Inc.," creates a high likelihood of confusion. There is no allegation that defendant's use of a logo or typeface design is confusingly similar to plaintiff's own logo; the focus is upon the words themselves.

Defendant contends that these two marks are not confusingly similar for three reasons. First, the principal part of plaintiff's mark is "Checkpoint" used as one word while the principal part of defendant's mark is "Check Point" used as two words. Second, defendant's full name includes "Software Technologies, Inc." while plaintiff's full name includes "Systems, Inc." Third, plaintiff and defendant use different stylized marks with their names.

Defendant's arguments are unavailing in this regard. Although defendant's name is "Check Point," it has often used—and others have often used in describing the company—the names "CheckPoint" or "Checkpoint" as one word as well. It is proper to give greater force and effect to the dominant feature of a mark, *Birthright v. Birthright, Inc.,* 827 F.Supp. 1114, 1135 (D.N.J.1993), and the dominant portions of these two marks are substantially identical. When the dominant portions of the two marks are the same and the overall impression created by the marks is essentially the same, "it is very probable that

the marks are confusingly similar." *Opticians Ass'n of America v. Independent Opticians of America,* 920 F.2d 187, 195 (3d Cir.1990). The additions of "Systems," "Software," "Technologies", and "Inc." are generic or common descriptive terms and not distinctive for the respective businesses and products. *See Securacomm Consulting, Inc. v. Securacom Inc.,* 984 F.Supp. 286, 300 (D.N.J.1997) (because "Consulting, Inc." and "Incorporated" are merely descriptive, "Securacomm" portion of mark must be considered dominant), *rev'd on other grounds,* 166 F.3d 182 (3d Cir.1999).

Were the additional descriptive terms and the logos always used in conjunction with the companies' names and marks, the similarity between them would not be as prevalent, for the logos are altogether different. However, the logos are not used every time the marks are, the words "Software Technologies" are not always used, and, on defendant's materials, "Software Technologies" appears in less prominent print. This factor favors plaintiff, indicating substantial identity between the plaintiff's mark and the dominant feature of defendant's mark, whether Checkpoint, CheckPoint, or Check Point.

### 2. *Strength of Plaintiff's Mark*

▪ The significance of the strength of the mark is that a strong mark is afforded greater protection. 2 J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:73 (4th ed.1996). "[T]he Lanham Act's tolerance for similarity between competing marks varies inversely with the fame of the prior mark. As a mark's fame increases, the Act's tolerance for similarities in competing marks falls." *Id.* (quoting *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.,* 963 F.2d 350, 353 (Fed.Cir.1992)). A strong mark may even be relied on to preclude use of a similar mark on goods and services different than, but related to, those on which the strong mark is used. *See Chips 'N Twigs, Inc. v. Chip–Chip, Ltd.,* 414 F.Supp. 1003,

1016 (E.D.Pa.1976) (finding the "CHIPS" family of marks "entitled to protection from use of confusingly similar marks even on non-competing goods, especially where goods are related in character"). *See also ChiChi's, Inc. v. Chi–Mex, Inc.,* 568 F.Supp. 731, 736 (W.D.Pa.1983) ("A weak mark will protect only similarly marketed goods, whereas a strong mark may be applied to protect noncompeting products.").

▪ Trademark strength is a function of a mark's distinctiveness and commercial presence developed through use and promotion. *ChiChi's, Inc.,* 568 F.Supp. at 735–36; *see also Securacomm,* 984 F.Supp. at 300. Courts use a four part scheme to classify marks as to distinctiveness: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *See Securacomm,* 984 F.Supp. at 300. A suggestive, arbitrary, or fanciful mark is inherently distinctive and protectable upon adoption. *Id.* A mark which is descriptive is entitled to protection if it has become distinctive through use, if, in short, it has gained a secondary meaning. *See Union Carbide Corp. v. Ever–Ready Inc.,* 531 F.2d 366, 380 (7th Cir.1976) ("EVEREADY" strong mark for electrical products).

Checkpoint has used its name and mark in connection with its electronic article surveillance ("EAS") products for more than thirty years continuously, extensively, and in a substantially exclusive manner, and that long use renders the mark strong within the physical surveillance field. *See Apollo Dist. Co. v. Jerry Kurtz Carpet Co.,* 696 F.Supp. 140, 142 (D.N.J.1988). In more recent years, plaintiff's use of its mark has accompanied its products and services in the EAC, CCTV, and RFID lines as well.

▪ CPS concedes the strength of plaintiff's mark in plaintiff's own field and that this factor should also fall in plaintiff's favor, but contends that this factor should not be accorded much weight both because plaintiff did not prove that plaintiff is well

known for EAC (instead of EAS) products and outside the physical security area and because the strength of the mark is undercut by the fact that the mark is descriptive. Thus CPS contends that the mark "CHECKPOINT" is a descriptive mark, one which is considered descriptive if it merely describes a characteristic or quality of the goods, such as the intended use, desirable features, or its end effect on the consumer. *See John H. Harland Co. v. Clarke Checks, Inc.,* 711 F.2d 966, 974 (11th Cir.1983). According to CPS, evidence of the descriptive nature of the mark includes plaintiff's CEO's testimony that "the Checkpoint name [is] a name that's synonymous with security. Checkpoint Charlie in Berlin, Germany is an example of that. (Dowd Tr. 41.) What the company does, Dowd testified, was to provide security "check points" where people pass back and forth, such as at the door of a store. (Dowd Tr. 116–17.)

However, "CHECKPOINT" has no descriptive significance when used in connection with the products of Checkpoint. This is conclusively proven by Checkpoint's two incontestable federal registrations, see *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 196, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) ("A mark that is merely descriptive of an applicant's goods or services is not registrable unless the mark has secondary meaning."). That plaintiff's mark is not descriptive is also shown inferentially by the fact that CPS itself applied to the U.S. Patent and Trademark Office to register "CHECKPOINT" as a trademark on the Principal Register, which is reserved for distinctive marks. Once a mark is incontestable, as plaintiff's is, it cannot be challenged as merely descriptive. *Park 'N Fly,* 469 U.S. at 196, 105 S.Ct. 658.

There has been no significant third party use of a similar mark by other commercial security-related goods or services. The only other "CHECKPOINT" company is a Florida-based residential alarm service. Defendant contends that the exis-tence of this company weakens plaintiff's mark because both make security systems, but such use does not detract from the strength of the "CHECKPOINT" mark and name, see *Specialty Measurements, Inc. v. Measurement Systems, Inc.,* 763 F.Supp. 91, 94–95 (D.N.J.1991) because plaintiff's products-like defendant's products—are clearly intended for corporate, not personal, use. *See Eclipse Assoc. Ltd. v. Data General Corp.,* 894 F.2d 1114, 1119 (9th Cir.1990) (evidence of third party use of mark on unrelated goods is irrelevant). Chequepoint, a check cashing and foreign exchange service, is clearly unrelated. Checkpoint is not obligated to deal with all infringers at the same time, and Checkpoint has been diligent in asserting its rights in the "CHECKPOINT" mark and name to prevent registration of marks confusingly similar to "CHECKPOINT" in the corporate security field. *Elizabeth Taylor Cosmetics Co. v. Annick Goutal, S.A.R.L.,* 673 F.Supp. 1238, 1248 (S.D.N.Y. 1987). Checkpoint's active program of policing its trademark is further proof of the strength of its mark. *E.I. DuPont de Nemours & Co. v. Yoshida Int'l., Inc.,* 393 F.Supp. 502, 512 (E.D.N.Y.1975); 2 J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11.91 (4th ed.1996). Thus, even if plaintiff's mark was not "suggestive," it could be characterized as "descriptive" with a secondary meaning.

Thus, plaintiff's mark is distinctive, either under this Court's analysis or, at the very least, as a result of its incontestable registrations, and its long use has rendered it strong. Checkpoint, a leading supplier of electronic article surveillance ("EAS") systems, has achieved this position through years of investment, promotion, and sales of goods under the "CHECKPOINT" mark and name. *See Prince Mfg. v. Bard Int'l Assoc.,* 11 U.S.P.Q.2d 1419, 1422–23, 1988 WL 142407 (D.N.J.1988) (degree of promotion and use are factors which establish a trademark's strength).

The Court notes, however, that plaintiff did not present any evidence of a customer survey indicating plaintiff's marks' strength, and thus there is no direct evidence probative of customer views. *See Commerce Nat'l Ins. Serv., Inc. v. Commerce Ins. Agency, Inc.,* 214 F.3d 432 (3d Cir.2000) (customer surveys relevant because probative of strength of the mark). Additionally, the evidence of record indicates that plaintiff's mark is strong within the physical security realm, that is, within the electronic article surveillance line which comprises more than 90% of plaintiff's business activity, but there is no evidence that it is strongly recognized either by MIS and IT personnel (those who would buy defendant's products) or the public at large. Also, plaintiff presented no evidence that any witness from the information security field had ever heard of plaintiff Checkpoint before this case, tempering this criterion. Plaintiff's mark may be strong, but that strength does not appear to extend beyond its own subfield of physical security with respect to electronic article surveillance.

3. *Price of Goods, Sophistication of Purchasers, Care and Attention Expected of Reasonable Consumers*

The high price of the goods at issue in this case and the technical specialization of the customers fall strongly in defendant's favor. As common sense dictates, the law provides that confusion is unlikely if the products or services at issue are complex and expensive, the purchasers highly sophisticated, and the purchase process one that is lengthy and requires close attention and analysis by the purchasers. *See, e.g., Astra Pharmaceutical,* 718 F.2d at 1206–07; *CIT Group, Inc. v. Citicorp,* 20 F.Supp.2d 775, 790 (D.N.J.1998); *Prince Mfg. Inc. v. Bard Int'l Assocs. Inc.,* 11 U.S.P.Q.2d at 1423, 1988 WL 142407. Here, both plaintiff's products and defendant's products are expensive. The purchasers of these respective products are, for the most part, highly sophisticated, and the sales process is lengthy. Though defendant continues to advertise its products as easy to install and use, they are not in fact so easy, and they are subject to intensive training sessions. Plaintiff's and defendant's products are not impulse purchases, but rather are subject to long sales efforts and careful customer decisionmaking, as described above.

It is recognized that even technically sophisticated purchasers can in some situations be confused as to affiliation between parties or the sponsorship of products based on concurrent use of marks and names that are as similar as the marks and names in the instant case. *See Interpace,* 721 F.2d at 464 ("even sophisticated customers in the electrical field should find it natural or likely that 'the manufacturer of Lapp ceramic insulators and pole hardware ... should expand into wire and cable.' "). However, the Lanham Act only protects "against mistaken purchasing decisions and not against confusion generally," *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 583 (2d Cir.1991), and the consumers' high level of sophistication in this case makes it far less likely that anyone would ultimately purchase one party's products believing the other to be the source of those products. If there is any initial interest confusion, it surely dissipates over the weeks and months in which the transactions take place. There is little or no likelihood of confusion at the end of such a purchase cycle. Indeed, out of hundreds of millions of dollars of transactions since defendant entered the United States market, there is no evidence that anyone has purchased a product of either the plaintiff or defendant mistaken as to its source. The high prices, careful purchasing processes, and sophistication of the customers, then, clearly favor defendant as to the overall lack of likelihood of confusion.

4. *Length of Time Parties Have Used Their Marks Without Evidence of Actual Confusion, and the Evidence of Actual Consumer Confusion*

Evidence of actual confusion between the parties is a significant, but not

determinative or necessary, factor bearing on the likelihood of confusion. *Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 205 (3d Cir.), *cert. denied*, 516 U.S. 808, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995); *Fisons*, 30 F.3d at 476; *First Keystone Federal Savings Bank v. First Keystone Mortgage, Inc.*, 896 F.Supp. 456, 462 (E.D.Pa.1995). The law recognizes that it is difficult to gather evidence of actual confusion, for random instances of confusion often go unreported and unrecorded. *See Playboy Enter., Inc. v. Universal Tel-A-Talk, Inc.*, No. 96-6961, 1998 WL 767440, at *6 (E.D.Pa. Nov. 3, 1998).[12] Therefore, if any evidence of actual confusion is found, it is highly probative of likelihood of confusion. *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 n. 5 (6th Cir.1982).

This maxim certainly holds true where the Court is faced with a motion for preliminary injunctive relief, where the parties have little time to gather evidence of actual confusion. It holds true in the present case as well, where the Court is faced with deciding whether to grant permanent injunctive relief, but its force is less strong, especially where, as here, the parties have co-existed for more than five years, the case has been alive for four years, and the parties have yet to come up with a single piece of evidence that any customer actually purchased, or even considered buying, one party's product mistakenly believing it to be made by the other party. In all the time that has passed, plaintiff has been able to come up with evidence of three types of confusion: temporary confusion in the corporate security marketplace among inquiring individuals; a few instances of confusion among industry commentators and financial analysts; and anecdotes of temporary reverse confusion, where someone who knew about defendant inquired whether plaintiff was a related company. By reverse confusion, plaintiff means that

the junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume that the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark-its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Fisons*, 30 F.3d at 474-75. Such reverse confusion threatens harm when the junior user "overwhelms" the marketplace such that the senior user begins to lose its identity and profile. This concern is of greatest force with competing or related products. In the present case, involving non-competing, unrelated products, such "overwhelming" has not even remotely occurred. Moreover, plaintiff's evidence of initial interest confusion is de minimis, and its evidence of media and investor confusion is weak.

The doctrine of initial interest confusion, adopted by numerous courts, recognizes that in some instances evidence that consumers initially mistake the source of a product may predict likelihood of confusion under the Lanham Act, even though that confusion is dissipated by the time of purchase. *See generally* 3 *McCarthy on Trademarks* § 23:6. It is acknowledged that, especially among competitors, if there is initial interest confusion, a sophisticated purchaser of expensive goods or services need only be confused at the time it is drawn into doing business with the junior user, for there to be infringement. "A Court may find infringement has occurred based on confusion that creates initial customer interest, even if no final sale is completed as a result." *Toy Mfrs. Of Am. v. Helmsley-Spear, Inc.*, 960 F.Supp. 673, 679 (S.D.N.Y.1997) (citing *Mobil Oil*, 818

---

**12.** Neither party submitted a survey on the issue of likelihood of confusion, but a consumer survey is not necessary. *Charles Jac-*

*quin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 476 (3d Cir.1990).

F.2d at 260). *See also ICON Solutions, Inc. v. IKON Office Solutions, Inc.,* 1998 WL 314672, at *8, 1998 U.S. Dist. LEXIS 8705, at *25 (E.D.Pa.1998). Where, however, the companies are non-competitors, initial interest confusion does not have the same consequence, because there is no substituted product to buy from the junior user, and the senior user does not bear the prospect of harm.

Defendant contends that the initial interest doctrine is of no relevance here because the two parties are not-competitors and their product lines are so specialized and diverse from one another, such that a prospective purchaser from one party would hardly be induced to purchase the product of the other, citing *Hasbro, Inc. v. Clue Computing, Inc.,* 66 F.Supp.2d 117, 125 (D.Mass.1999). This Court does not read *Hasbro* as holding that the initial interest confusion doctrine is never applicable if the parties are not competitors.[13] However, *Hasbro,* and numerous other cases, correctly emphasize the importance of the parties' competition or strong interrelatedness.

A review of cases which have applied the initial interest doctrine indicates that the parties are either direct competitors, see *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331 (2d Cir.1975) (parties both made pianos), *McNeil–PPC v. Guardian Drug Co.,* 984 F.Supp. 1066 (E.D.Mich.1997) (look-alike branded product), or strongly interrelated such that it could be expected that plaintiff would expand into defendant's market, see *Elvis Presley Enterprises, Inc. v. Capece,* 141 F.3d 188 (5th Cir.1998) (defendant was a Velvet Elvis sixties-themed nightclub). Other cases have also pointed out that one element of applicability of the initial interest confusion doctrine is an intent by the defendant to deceive. *See, e.g., Dorr–Oli-*

*ver, Inc. v. Fluid–Quip, Inc.,* 94 F.3d 376 (7th Cir.1996) (initial interest confusion doctrine is viewed as a variation of "bait and switch"); *Eli Lilly & Co. v. Natural Answers, Inc.,* 86 F.Supp.2d 834, 845 (S.D.Ind.2000) (initial interest confusion "occurs when a competitor lures potential customers by initially passing off its goods as those of another, even if confusion is dispelled by the time sales are completed"); 3 *McCarthy on Trademarks* § 23:6 (analogizing initial interest confusion to a jobseeker who misrepresents his educational background on a resume, gets an interview, and then claims that the misrepresentation was only a typographical error).

The record does contain evidence that some individuals asked plaintiff's representatives about the firewalls plaintiff allegedly made and sent e-mails to "njcheckpt.com." Dr. Sherizen, David Johnston, and Peter Ohlhausen each testified that he previously believed in error that there was an affiliation between the parties. John Morency, CPS' own expert, also conceded the possibility of confusion as to affiliation between the parties. Nonetheless, the Court finds that plaintiff has not demonstrated that the incidents of temporary confusion or other confusion in spheres unrelated to purchasing activity is a harbinger of likelihood of confusion in purchasing decisions. As the following sections of this Opinion discuss, there is no evidence that defendant intentionally chose its name to capitalize on plaintiff's goodwill, and while the companies sell products in the broad field of security, they are not competitors and consumers would not expect plaintiff to move into defendant's market, for the fields of physical security and network security are not converging. Therefore, while evidence of temporary initial interest confusion is not completely

---

**13.** In that case, the parties' products were related but not competitors (plaintiff Hasbro made the board game Clue® and the CD ROM version of that game, and defendant was a computer consulting business of the same name which operated largely over the Internet). The district court in that case did not rule out initial interest confusion just because the two companies did not directly compete, but rather found that the evidence of initial interest confusion (two or three people over four years) was weak. *Id.* at 124–25.

irrelevant, such evidence is entitled to less weight than it might be in a case where the parties compete or are strongly interrelated, or where there is evidence or even an inference that defendant was trying to trade on plaintiff's goodwill. These factors are utterly absent here. Moreover, the evidence of initial interest confusion in this case is de minimis. A number of the phone calls, for example, cannot be attributed to a mistake on the part of any consumer, but rather an error on the part of a directory assistance operator; a consumer may well have asked the operator for one company and received the phone number for the other company. This record indicates that the same problem has arisen when consumers call plaintiff asking for Chequepoint, the check cashing service, though it is unlikely that a consumer seeking Chequepoint would be confused into thinking that plaintiff Checkpoint is the true source of the check cashing service which the consumer was trying to reach. Of course, as plaintiff presented no testimony by a consumer who was initially confused, it is impossible for this court to discern how many of the calls made in error were misdirected rather than the result of consumer confusion; operator confusion is not actionable under the Lanham Act.

Even if all phone calls in error were to be considered, the few instances of transposing corporate names are to be judged against the fact that the parties have coexisted for more than five years, and defendant was a visible participant in the booming Internet industry for at least the last four of those years, while plaintiff has also experienced substantial growth in the field of retail electronic article surveillance. Of course, "[t]he weight attributed to instances of actual confusion depends to some extent upon the circumstances of the case, including the volume of sales of the goods involved. If isolated instances of actual confusion result from the sale of a substantial number of goods, the weight given to that evidence of actual confusion is markedly reduced." *Nippondenso Co.,*

*Ltd. v. Denso Distributors,* Civ. No. 86–3982, 1987 WL 10703, at *5 (E.D.Pa. May 11, 1987) (citing *Scott Paper,* 589 F.2d at 1225). *See also CIT Group,* 20 F.Supp.2d at 789; *Harlem Wizards,* 952 F.Supp. at 1098. In this case, despite the burgeoning commercial activities of these two companies, each engaging in hundreds of millions of dollars of sales annually, the absence of confusion as to the origin of either party's products in the marketplace is very telling.

This situation is similar to that in *Scott Paper Co., supra,* where the Third Circuit determined that nineteen misdirected letters (arising from sale of 50 million products) received between 1972 and 1976 did not warrant injunctive relief, where the common element of the marks comprised a common surname, the parties had coexisted for over forty years, and the products at issue were mass marketed consumer products. Similarly in this case, the impact of instances of initial confusion is minimal, especially in light of the fact that plaintiffs did not produce, at any time in the four year history of this litigation, a single piece of evidence of a mistaken purchasing decision. Initial confusion regarding non-competitors or misdirected telephone calls do not amount to the type of actual confusion that is actionable under the Lanham Act, namely likelihood of confusion through mistaken purchasing decisions. *See Commerce, supra,* 214 F.3d 432 (Third Circuit notes that plaintiff "was unable to produce a single instance of actual confusion between it and" the defendant, despite the fact that earlier in the Opinion, the Third Circuit noted some instances of initial confusion). Therefore, any evidence of initial confusion in this case is de minimis.

Likewise, the plaintiff's other evidence of confusion is weak. The Court acknowledges that evidence of any confusion at all, by investors, purchasers, or the media, may still affect this Court's determination of whether there is a likelihood of confusion by purchasers, for if there is evidence

that, for example, the media, whose words purchasers read, is confused about the names of these companies, then it is more likely that purchasers will be confused as well. *See Acxiom Corp. v. Axiom, Inc.*, 27 F.Supp.2d 478, 501 (D.Del.1998) (court specifically relied on investor and media confusion in making determination of likelihood of confusion, noting that the language of the Lanham Act shows a clear congressional intent to "outlaw the use of trademarks which are likely to cause confusion, mistake, or deception of any kind, not merely of purchasers nor as to source of origin.").[14] *See also Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1248, 1251 (4th Cir.1970) ("One witness, however, testified that he was initially confused when his broker advised him of the purchase of Comcet's stock. The fact that the true identity of Comcet was quickly recognized is of little moment. The significance of this incident is its role as a harbinger of confusion . . . ."). Here, there is some evidence of initial confusion by the media and investors when defendant first gained success in the stock market, but that confusion has dissipated, rather than grown, over the years, such that there appears to have been none in the last few years. Moreover, the significance of such initial confusion by the media and investors, like initial confusion by consumers, lies only in assessing whether it supports the conclusion that confusion in consumer purchasing decisions is likely.[15]

Though that evidence is relevant, here it is minimal, especially when contrasted against the glaring absence of evidence of any actual confusion in purchasing decisions in the time that the parties have co-existed, and the incentives to ferret out such confusion during the long pendency of this dispute, and in light of the fact that all mistakes have been quickly and easily remedied. *See Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 583 (2d Cir.1991) (citation omitted) (finding that the Lanham Act protects " 'only against mistaken purchasing decisions and not against confusion generally,' " and that general confusion that is immediately dispelled is not a cause for concern under the trademark laws).

The most relevant evidence of actual confusion is the "testimony of a 'reasonably prudent purchaser' who was in fact confused by defendant's trademark." 3 *McCarthy on Trademarks* § 23:13; *see also Fisons*, 30 F.3d at 476. Though plaintiff did have incentive and ability to find such confusion if it occurred, *see McCarthy on Trademarks* § 23:18, by asking its sales persons, distributors, and customers, Checkpoint did not offer any testimony of a confused purchaser at trial, showing an absence of reverse confusion (*i.e.*, where a Checkpoint customer seeks to purchase a Checkpoint product because the customer believes it originated from CPS). Similarly, plaintiff located no CPS customers who indicated they became interested in a CPS product because they thought it originated from Checkpoint. To sum up, any evidence by the plaintiff of initial interest confusion by consumers and initial confusion by some reporters or other observers, is de minimis and weak, and the record is completely devoid of any evidence of an

---

**14.** Defendant cites *Electronic Design & Sales*, 954 F.2d at 716, *Harlem Wizards*, 952 F.Supp. at 1098, *First Keystone*, 923 F.Supp. at 705, *Castle Oil Corp. v. Castle Energy Corp.*, 26 U.S.P.Q.2d 1481, 1490, 1992 WL 394932 (W.D.Pa.1992), and *Taj Mahal Enters. v. Trump*, 745 F.Supp. 240, 249–50 (D.N.J. 1990), in support of its contention that numerous cases disagree with *Acxiom* about the relevance of investor and media confusion. None of those cases actually discuss investor confusion, but rather they stand for the general principle that it is mistaken consumer purchasing decisions that are relevant. This

Court agrees with defendant that the ultimate question is, as many of these cases state, whether it is likely that consumers of the products will be confused in their purchasing decisions. This Court is concerned with whether, as the court in *Harlem Wizards*, 952 F.Supp. at 1098, asked, there is "evidence that these purported instances of actual confusion could have any effect on consumer purchasing decisions." *Id.*

**15.** *Id.*

actual mistaken purchase or attempt to purchase one company's products believing they originated with the other company. Especially when viewed in light of the parties' co-existence for over five years, this lack of evidence of any confusion in purchasing decisions of either company's products falls strongly in defendant's favor.

### 5. Intent of Defendant in Adopting the Mark

■ A finding of intentional infringement is, like evidence of actual confusion, not necessary for a finding of likelihood of confusion, *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 875 (2d Cir.1986), and good faith is not a defense to a charge of trademark infringement, *One World Botanicals Ltd. v. Gulf Coast Nutritionals, Inc.,* 987 F.Supp. 317, 334 (D.N.J.1997), although the presence of predatory intent weighs strongly in favor of a finding of likelihood of confusion. *National Football League Properties v. New Jersey Giants, Inc.,* 637 F.Supp. 507, 518 (D.N.J.1986).

■ In this Court's October 28, 1999 Opinion addressing the parties' renewed motions for summary judgment, this Court granted summary judgment to defendant on the factor of defendant's intent, finding no evidence that defendant intended to infringe plaintiff's mark. In its papers and at oral argument on the motion, plaintiff had been unable to present any relevant evidence of bad faith or willfulness. (*See* 10/28/99 Slip Op. at 9, n. 2.) Plaintiff had conceded lack of bad faith or willfulness only for the purposes of that summary judgment motion, but this Court nonetheless gave plaintiff an opportunity to put forth any evidence of bad faith or willfulness at oral argument. The one type of evidence which plaintiff attempted to advance, this Court rejected, for reasons explained in footnote 2 to that Opinion.[16]

CPS knew of plaintiff's mark at the time that it decided to use the "Check Point" mark in the United State. Plaintiff's Check Point Systems name was chosen because its parent company, in Israel, had the name Check Point. The company's founder, Shlomo Kramer, chose the name because he felt the name connoted a point in a network where traffic is checked. He had not actually heard of plaintiff. That CPS chose not to discontinue its use of the Check Point mark after receiving plaintiff's cease and desist request did not evidence bad faith because that decision reflected a reasonable assumption that the two companies' respective spheres were, and would continue to be, unrelated. Although defendant could have done more to ascertain the scope of plaintiff's commercial activities, its failure to do so does not show intent to adopt plaintiff's mark, nor would further inquiry by defendant have produced any significant reason to refrain from using the same mark in the United States that it had innocently begun using in Israel upon its founding several years before.

In short, this lack of intent to use plaintiff's name favors defendant. There is no evidence or even inference that defendant chose its name with plaintiff's name or products in mind. Further investigation by defendant before using the Check Point name in the United States would have confirmed that the parties are not competitors, that they do not market similar products or services, and that their marketing channels do not intersect on any products.

---

16. The Court also fully discussed the potential evidence of bad faith or willfulness in addressing defendant's motion for summary judgment that plaintiff was not entitled to recover damages and attorneys' fees. (*See id.* at 43–46.) Plaintiff has not suffered lost sales, and thus damages and attorneys' fees could only be awarded if plaintiff proved that defendant willfully infringed its trademark. (10/28/99 Slip Op. at 42.) Because this Court found a lack of evidence of bad faith or willfulness, this Court granted summary judgment to defendant on plaintiff's claims for damages and attorneys' fees, noting that if plaintiff proved likelihood of confusion at trial, only injunctive relief would be awarded.

### 6. *Parties' Channels of Trade, Markets, Target Customers, and Likelihood of Expansion*

The final four factors are whether the parties market their products through the same trade channels and markets, whether they have the same target customers, the relationship of goods in the minds of potential customers, and other factors showing that consumers expect plaintiff to enter defendant's field or that plaintiff is likely to expand into defendant's market. Because the four categories overlap so much, this Court will discuss them together.

The import of these categories is that likelihood of confusion is not determined in the abstract, but based on the respective marks and names as applied to the respective goods and services and businesses, *i.e.,* the context of the marketplace. *Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565, 1569 (Fed.Cir.1983).

As this Court has already explained in Parts II.A.5, II.B.5, and II.C. of this Opinion, Checkpoint and CPS operate in separate and distinct segments of the overall field of corporate security. Plaintiff's sphere includes physical security and control of flow of corporate goods and people in EAS, EAC, and RFID. Defendant's sphere includes electronic information security on computer networks at the point of connection to the Internet and within the customer's intranet. Their products are not substitutes for each other. As discussed at length above, their products are advertised in different magazines and are promoted in entirely different trade shows. There is no evidence that plaintiff's products and defendant's products were offered at the same time in any magazine, trade show, or distribution network.

Additionally, as discussed above, plaintiff's competitors and defendant's competitors rarely even advertise in the same media. Plaintiff's competitors and defendant's competitors rarely market their products at the same trade shows, either. That there is no overlap in the places these parties market their products tends to diminish the chance that someone who is a specialist in network security will even come across an advertisement for plaintiff, and vice versa.

Plaintiff's products will not someday compete with defendant's firewalls and VPNs, which are not off-the-shelf consumer products and which are distributed through defendant's VARs, none of which carries plaintiff's products or any physical security products similar to plaintiff's products. In an attempt to sell its products to a company, plaintiff may well face both a corporate security director and, at a later stage, an MIS specialist; it is conceivable that the MIS specialist may be familiar with defendant if the MIS specialist is cognizant of firewalls and defendant's position in the firewall field of network security.

The growth of the physical security segment toward greater involvement with information security personnel also means that a knowledgeable industry participant could possibly conclude upon seeing defendant's product in advertising or trade shows, that plaintiff has expanded into the network security field. Although this is a possibility, it is not likely. A knowledgeable participant would also be apt to know that the defendant has made a name for itself in its very specialized niche. Further, knowledgeable participants in the network security industry who testified at trial, including defendants' experts, testified credibly that neither they nor other specialists had been aware of plaintiff before being called upon in this litigation.

Plaintiff does not currently have plans to make a firewall or even to enter the field of network security at all,[17] and any over-

---

**17.** Part of the reason for trademark protection, however, is to protect plaintiff's right to someday enter defendant's market if it so chooses. *Interpace,* 721 F.2d at 464. Though plaintiff has not expanded into that market, the unsuccessful experience of Kroll O'Gara

lap in the target audiences of the parties' sales processes for their related products is coincidental, not intended. This is not a situation where, in the mind of consumers, there is market convergence between related and complementary products.[18] The Court acknowledges that there need not be total market convergence for confusion to be likely, for the sale of products with a strongly similar name in closely related submarkets may suffice to support a finding of likelihood of confusion. *See Charles Schwab & Co., Inc. v. Hibernia Bank,* 665 F.Supp. 800, 809–10 (N.D.Cal.1987). This case, however, does not present any significant overlap in the targeted markets for the products of these two companies.

The defendant has an extremely restricted sales channel. A potential customer for defendant's network security products will deal with a specialized value added reseller ("VAR") which is part of defendant's sales network. While dealing through the VAR, the potential customer—which will be represented by a technically specialized employee or officer—will not encounter any of plaintiff's products, nor any similar physical security products. It is thus an impossibility that the potential purchaser interested in defendant's products, dealing with one of defendant's VARs, will somehow encounter plaintiff's name or product along the way. Likewise, it is not likely that a potential purchaser interested in plaintiff's product lines will encounter defendant's name or products at any point.

Accordingly, the Court find that the parties do not market their products through the same trade channels or markets, and that their target customers generally belong to distinctly different groups. The Court further finds no relationship between their products in the minds of customers, and no evidence that either company intends to expand (or would reasonably be thought to be likely to expand) into the other company's field. Each of these characteristics, separately and as a group, weigh in favor of the unlikelihood of relevant confusion at present or in the future.

### B. Ultimate Conclusion of Law: No Likelihood of Confusion

Ultimately, this Court finds that plaintiff has not met its burden of proving likelihood of confusion by a preponderance of the evidence. The strong similarity between defendant's and plaintiff's marks is the only substantial factor pointing toward confusion between these non-competitors. The parties operate in different segments of the broad corporate security industry. Defendant's business is highly specialized in the technologically advanced field of Internet and Internet security, and is not oriented at all towards physical security. Plaintiff's products, like many aspects of business, are becoming more reliant on computer software and the Internet, but this fact of modern life does not turn plaintiff into an Internet company. Interaction of information security specialists and physical security specialists in the purchasing decision is limited to assuring that plaintiff's products can be integrated with a customer's computer network, similar to

and other physical security companies that have attempted to expand consulting functions into network security markets tends to undermine to the idea that network security may be within the zone of natural expansion for companies that once had their focus only on physical security. *Compare Novar Electronics Corp. v. Demetron Research Corp.,* 213 U.S.P.Q. 147, 153, 1980 WL 39029 (T.T.A.B. 1980). Network security, as discussed above, is a highly specialized field dominated by companies such as defendant which are expert in the intricacies of electronic networks and the techniques of electronic intrusion.

Nothing in the record indicates that plaintiff has the requisite expertise or the interest in achieving entry into defendant's field.

18. In *Comcet,* the plaintiff sold global communications services to communications common carriers and the federal government, while defendant developed, manufactured, and sold communications computers. 429 F.2d at 1248–49. The Fourth Circuit agreed with the district court that "the parties are in different but sometimes interrelated industries." 429 F.2d at 1252.

any other application. Physical security trade shows and magazines occasionally expose physical security and corporate security specialists to the basics of firewalls and computer security, but few if any experts in the general corporate security field (including plaintiff's own experts) knows much about firewalls, VPNs, or the companies that produce them. Few companies have integrated network and physical security under the auspices of a corporate security director, and at least one has provided consulting services on both network and physical security without success.

Plaintiff has not proven that confusion is likely. The products of plaintiff and defendant are expensive, highly specialized in function, and subject to long sales processes, making highly unlikely the possibility that any customer would mistakenly purchase one party's products believing the other to be the source of those products. MIS and IT personnel tend to become involved in plaintiff's sales process only later in the cycle, after the customer has already identified plaintiff as the likely source of the products it needs, when the customer endeavors to discover if plaintiff's product can work with the customer's computer operating systems; such considerations have nothing to do with defendant's firewalls or virtual private network products. The products of plaintiff and defendant are marketed at different trade shows and in different magazines, and they are sold by different value added resellers. Indeed, the parties have co-existed for over six years, and throughout the four years of this litigation plaintiff failed to come forward with evidence of one instance in which a mistaken purchasing decision was made or nearly made with regard to either company's products. All plaintiff presented was evidence of a number of mistaken initial inquiries and some investor confusion, most of which were quickly and easily remedied and all of which pale in comparison to the large volume of calls, letters, and business that these two companies received in the past

six years. There is no evidence that even the minor degree of investor confusion has continued; indeed, the markets seem to distinguish readily and routinely between the two companies' stocks.

Overall, the Court concludes that it is not probable that a consumer viewing defendant's mark would assume that the product is associated with plaintiff, and it is also not probable that a consumer viewing plaintiff's mark would assume that the product is associated with defendant.

The balance of all relevant factors indicates that while customer confusion is possible, it is not likely. The Court finds that plaintiff has failed to meet its burden of proving trademark infringement or unfair competition by defendant, and no violation of 15 U.S.C. §§ 1114 or 1125(a) has occurred. Therefore, this Court will find in favor of defendant CPS.

The accompanying Judgment shall be entered.

### *FINAL JUDGMENT*

This matter comes before the Court upon a non-jury trial; and the Court having conducted a non-jury trial on November 1–4, 8–10, and 23, 1999 and having additionally considered the parties' final arguments and proposed findings of fact and conclusions of law; and for the reasons expressed in this Court's Findings of Fact and Conclusions of Law, issued on this date;

IT IS this day of July 2000 hereby

ORDERED and ADJUDGED that JUDGMENT be entered in favor of the defendant, Check Point Software Technologies, Inc., and against the plaintiff, Checkpoint Systems, Inc., no cause for action.